Capocasa, Appellant, v. First National Bank of Stevens Point, Respondent.

*October 31—November 28, 1967.*

716

For the appellant there was a brief and oral argument by *Robert Dewa* of Madison.

For the respondent there was a brief by *Peickert, Anderson, Fisher, Shannon & O'Brien* of Stevens Point, and oral argument by *Gerald M. O'Brien.*

HEFFERNAN, J. The mortgage executed in June of 1963 by the Capocasas provided not only that the property serve as security for the present consideration of

$10,600, but also for any "further sums of money which may be or become owing" to the bank. There is no doubt that mortgages to secure future advances serve a socially and economically desirable purpose.[1]

Wisconsin has long recognized that a mortgage can secure future advances and the lien of the mortgage will attach at the time of the mortgage even though the advances are made at a later date. *Carter v. Rewey* (1885), 62 Wis. 552, 22 N. W. 129; *Wisconsin Planing Mill Co. v. Schuda* (1888), 72 Wis. 277, 39 N. W. 558; *Claridge v. Evans* (1908), 137 Wis. 218, 118 N. W. 198, 118 N. W. 803.

Sec. 215.21 (4) (b), Stats., specifically recognizes that saving and loan associations may enter into mortgages that will secure additional advances so long as the total does not exceed the stated amount of the mortgage.

However, the question posed by this appeal is whether the mortgage will secure a subsequent note given by one of the borrowers, in this case the husband, for a consideration unrelated to the original purpose of the mortgage when the other party had no knowledge of the other

---

[1] "There are many transactions in which business desirability is heavily on the side of a mortgage securing not only a presently created or preexisting debt but future obligations as well. Typical of such dealings are construction or improvement loans with instalments to be advanced as the work progresses; mortgages by way of indemnity for prospective indorsements, guarantees, and accommodations of commercial paper to be issued by the mortgagor; fluctuating current balances under lines of credit established with the mortgagee; and as security for a bond issue, or a series of issues. The advantages of such arrangements in which the borrower wants only a fraction of the loan to begin with but will need more in the future are numerous and substantial. The mortgagor saves interest on the surplus until ready to use it and escapes the burden of proper investment of it for the interim. He also avoids the expense and inconvenience of refinancing the mortgage so as to include the additional needed sum, or, in the alternative, of executing second and later mortgages for each new advance with attendant higher interest rates and financing charges." Osborne, *Mortgages* (hornbook series), p. 276, sec. 113.

mortgagor's personal note and did not consent to subjecting the mortgaged property to this additional debt.

The bank relies upon the express language of the mortgage:

"Provided Always, and these presents are upon this express condition, that if the said parties of the first part, their heirs, executors and administrators, shall pay or cause to be paid to the said party of the second part, its successors or assigns, the sum of Ten Thousand Six Hundred and no/100 Dollars, according to the conditions of one promissory note bearing even date herewith (and any and all renewals or partial renewals thereof), executed by said parties of first part to said party of second part, and also *such further sums of money which may be or become owing by the parties of the first part, or any or either of them,* to the party of the second part, its successors or assigns, at any time hereafter and prior to the release in writing of this mortgage by the party of the second part, its successors or assigns, and shall moreover punctually and exactly perform, keep and observe each and every covenant, agreement, stipulation and condition herein contained, then these presents shall be null and void." (Emphasis supplied.)

Taken literally, this language is sufficient to embrace Capocasa's subsequent note to the bank as being within the security afforded by the mortgage. The new note given by him was for a "further sum(s) of money which . . . become(s) owing by . . . either [mortgagor] . . . to the party of the second part [the bank]."

Yet it is apparent that the literal enforcement of the clause would result, under the circumstances, in the perpetration of an inequitable result not intended by the parties. The bank claims that any indebtedness by any of the parties, no matter how incurred, falls within the net of the mortgage. The burden of specifically proving the indebtedness secured by the mortgage is upon the mortgagee. 59 C. J. S., *Mortgages,* p. 212, sec. 163. Any ambiguity, of course, must be resolved against the mortgagee. *McCollum v. Braddock Trust Co.* (1938), 330 Pa.

293, 198 Atl. 803. The bank appears to rely upon the marital relationship for its proof. The bank takes the position that Carole Capocasa took Lawrence Capocasa as her husband for "better or worse" and that, therefore, she has no reason to complain if he improvidently signed a note that subjected the property to a further mortgage liability. The sweep of the respondent's claim is indicative of the harsh results that would result not only in this case but in others if the bank's rationale is to prevail. That rationale is, however, inappropriate; for the significant relationship is not that Lawrence and Carole were husband and wife, but that they were joint tenants and comortgagors of the same real estate. The rule that defendant proposes is, therefore, not limited to the marital relationship, for its Draconian effect would apply to all who, with others, sign mortgages that contain the "dragnet" clause. In the instant case it is apparent that the plaintiff was not aware of her husband's giving the personal note until she was so informed when she tried to sell her property and until that time had no idea that such conduct could affect her interests in the property.

This case seems to be one of first impression in this jurisdiction. However, a study of the cases elsewhere shows that such clauses and claims like that asserted by the bank herein are likely to be looked upon with disfavor by the courts. In *Brose v. International Milling Co.* (1964), 256 Iowa 875, 879, 880, 129 N. W. 2d 672, the Iowa Supreme Court stated:

". . . such provisions are not favored and should be closely scrutinized, but it will be enforced to the extent it appears to have been within the intent of the parties. First v. Byrne, 238 Iowa 712, 28 N. W. 2d 509, 172 A. L. R. 1072, and cases therein referred to."

The Arkansas Supreme Court, in *Berger v. Fuller* (1929), 180 Ark. 372, 377, 21 S. W. 2d 419, has denominated such clauses as "anaconda" clauses:

". . . as by their broad and general terms they enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage which he did not contemplate, and to extend them further than has already been done would, in our opinion, be dangerous and unwise; for, if this should be done, some one who might have been engaged extensively in business, and by reason of financial reverses become largely indebted, and who had selected from his property a small portion upon which he and his family might dwell as their homestead, and from that vantage point begin the battle of life anew, might be deprived of it by grasping and unconscionable creditors."

The writer of a note appearing in 38 Minn. L. Rev. (1953–1954), 507, observed courts generally view "these clauses with disfavor, and generally place limitations on the indebtedness which may be secured by the mortgage" (p. 512), and "The use and enforcement of clauses as broad in scope as the ill-reputed 'dragnet-clause' could curtail the widespread acceptability of these mortgages." (p. 522.)

In the case of *First v. Byrne* (1947), 238 Iowa 712, 28 N. W. 2d 509, 172 A. L. R. 1072, the court refused to allow the promissory note of one of two mortgagors given for an antecedent personal debt to be secured by the interest in the property of the other mortgagor. The "dragnet" clause in that case provided:

" 'It is further expressly agreed that this mortgage shall stand as security for any other indebtedness, direct or contingent, that the mortgagee may now hold or in the future during the life of this mortgage acquire against the said mortgagors, or either or any of them.' " (p. 713.)

The court, in holding the clause ineffective to charge the other mortgagor's interest and only effective to charge the interest of the mortgagor giving the note, said:

"To construe the language here as creating such a relationship to secure indebtedness the existence of which

was unknown to the surety, and, of course, not intended by him to be secured, would be to countenance a situation inviting abuse and unfair dealing. It would give the indebted comortgagor and cotenant in effect a power of attorney to impose a lien upon the other's interest for his own benefit, to make the other a surety for the payment of his own debt. As a court of equity we cannot so construe it. Such a result should not be presumed or declared except upon a clear showing of intention." (p. 719.)

The Iowa court thus takes the position that a joint mortgagor is bound by the "dragnet" clause to the extent that his individual interest in the property will be security for his own antecedent or subsequent obligations to the mortgagee.

Other courts have held that the dragnet clauses are *wholly* ineffective unless the debts they purport to secure "were in the contemplation of the parties" at the time the mortgage was executed. Typical of these cases is *Wood v. Parker Square State Bank* (Texas, 1966), 400 S. W. 2d 898, in which a mortgagor borrowed from a bank under a clause that provided that the trust deed covered all other indebtedness that might accrue and become owing in the future. Subsequently, the bank purchased the borrower's note from an unsecured creditor and sought to enfold it within the protection of the "anaconda" clause of the mortgage. The Texas court refused to allow it, saying:

"Here . . . there is no showing that the mortgagor intended that his property be security for anything other than future advances made directly to him or on his behalf, and with respect to dealings between him and the holder of the mortgage." (p. 901.)

*National Bank of Eastern Arkansas v. Blankenship* (D. C. Ark. 1959), 177 Fed. Supp. 667, 673, capsulizes the reasoning of the Arkansas Supreme Court and concludes that if a "dragnet" is to be effective and in the contemplation of the parties:

". . . the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms, and, to be extended to cover debts subsequently incurred, these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred. The reason is that mortgages, by the use of general terms, ought never to be so extended as to secure debts which the debtor did not contemplate."

In *Beavers v. LeSueur* (1939), 188 Ga. 393, 3 S. E. 2d 667, it was held that the "dragnet" clause did not operate to secure a lender's subsequent claim against Le Sueur arising out of a lawyer-client relationship.

Thus, the "contemplation of the parties" cases deny any coverage under the "dragnet" clause unless the obligation to be blanketed in is specifically mentioned, is within the evident contemplation of the parties, or is of the identical nature as the original indebtedness.

While the test set forth above—was the obligation sought to be secured within the contemplation of the parties at the time of the execution of the mortgage—has much to recommend it from the viewpoint of logic, it permits a debtor to secure additional loans or to incur additional obligations without subjecting his individual property interests to the "dragnet" clause. While it protects an innocent joint tenant, it also permits the benefiting party's property to escape from the mortgage consequences of the additional borrowing. There seems to be no good reason for one who has executed a mortgage with "dragnet" clause to be permitted to escape its consequences for his personal borrowing merely because subjectively it was not within his contemplation (contrary to the words of the written instrument) that an additional obligation to the same creditor would subject his property to the "dragnet" feature of the mortgage.

For this reason we deem the Iowa approach to be more reasonable and more equitable with respect to both

the creditor and the unknowing or nonparticipating joint tenant mortgagor.

The rationale of the Iowa cases is that although the "dragnet" clause is insufficient to subject the interest of all joint tenants to its terms, nevertheless, a joint tenant who incurs an obligation to the same mortgagee ought to have *his* interest in the joint property subject to the mortgage.

In *First v. Byrne, supra,* page 720, the Iowa Supreme Court stated:

> "We construe the 'dragnet' clause to mean that each mortgagor pledged his undivided interest in the mortgaged premises to secure, in addition to the specifically named joint indebtedness: first, any other existing or future *joint* indebtedness of the mortgagors to the mortgagee; second, any other existing or future *individual* debt of the mortgagor whose interest is sought to be foreclosed upon; and third, any existing or future debt of the other mortgagor which was known to the one whose interest is sought to be held and by him consented to or acquiesced in as being included in the lien upon his interest."

The essence of the Iowa rule is that a "dragnet" clause should not be permitted to extinguish the interest of other comortgagor joint tenants without their knowledge and consent, but should subject the interest of the comortgagor who incurred the additional debt to the mortgage.

In the present case, Carole Capocasa neither knew nor consented to Lawrence Capocasa's subsequent note that would subject the property to additional liability. However, there is the undisputed testimony that the bank did rely upon its "anaconda" mortgage to secure the note that it took from Capocasa in exchange for the corporate worthless note. While this conduct is neither illegal nor fraudulent, we are constrained, nevertheless, to frown upon the bank's surreptitious attempt to charge

this unrelated obligation against Carole Capocasa's interest in the property, after she in good faith, on July 24, 1963, went to DeBaker and informed him of her husband's absconding and told him that she would try to keep up the payments on the mortgage. Yet less than a month later the bank secured a personal note from Capocasa with the avowed intention of loading it onto the mortgage that Carole said she would pay if she could. Good faith on the part of Mrs. Capocasa was met with something less than frankness and full disclosure. This is particularly evident when it was admitted that no demand was ever made upon Carole Capocasa for the payment of Lawrence's note, and no attempt was made to advise her of the liability, until she arranged for a sale of her property. Instead of notifying her of what it considered to be her true liability, it permitted her to think that if she paid the face of the mortgage the property would be free and clear. The bank, when it learned of the sale, without notice stepped in to siphon off what it then for the first time claimed against Carole. The fact that this situation could arise unbeknownst to a mortgagor speaks volumes of the potential inequities, irrespective of any improper intent, that can arise out of a "dragnet" mortgage. The fact that the bank, in law and equity, should be entitled to subject Lawrence Capocasa's share of the property to the mortgage does not under the circumstances entitle it to any lien on Carole's share. Only Lawrence's undivided one-half interest as a joint tenant falls within the toils of the "anaconda" clause—and then only because he was the active participant in the second note transaction, thereby giving consent by his action to the charging of his interests.

We conclude therefore that, when a "dragnet" clause is made a part of a mortgage executed by joint tenants, each mortgagor pledges his undivided interest in the mortgaged property to secure (1) the joint indebtedness or other indebtedness specifically named in the instru-

ment, and any existing or future *joint* indebtedness of the mortgagors to the mortgagee; (2) any existing or future individual indebtedness to the mortgagee; and (3) any future debt of his comortgagor which is known to him and to which he consents to be a lien upon his interest; provided (4), in addition, that whenever the proceeds or the benefits derived from the other mortgagor's contracting a further obligation inure to the enhancement of his interest, the "dragnet" clause will be construed to cover such indebtedness to the extent of that enhancement notwithstanding the fact that the mortgagor did not know of or consent to the indebtedness.

In the instant case the record shows that Carole Capocasa did not consent to the debt that Lawrence contracted with the bank when he signed a personal note in lieu of the corporate one, nor did the proceeds of that obligation inure to the benefit of, or the enhancement in the value of, Carole's interest in the mortgaged property. Her interest is not subject to the mortgage lien generated by the acceptance of the second note; but by his action of giving the note, coupled with his covenants in the mortgage, Lawrence Capocasa's interest in the property became subject to the additional lien arising out of this new obligation.

After the sale of the home by Carole Capocasa, $1,881.-73 of surplus proceeds was placed in escrow to abide the determination of the status of the lien acquired by the bank when it took Lawrence's note. Consistent with the reasoning herein, we conclude that the bank's lien attaches only to the undivided one-half interest of Lawrence; and, accordingly, one-half of the surplus proceeds are payable to the bank. The other half is Carole's free and clear of the bank's claim.

*By the Court.*—Judgment reversed and cause remanded for further proceedings consistent with this opinion.

CURRIE, C. J. (*dissenting*). I respectfully dissent. The instant mortgage contained a clause that it was security for the $10,600 mortgage note "and also such further sums of money which may be or become owing by the parties of the first part [the Capocasas], or any or either of them, to the party of the second part [the bank], its successors or assigns, at any time hereafter and prior to the release in writing of this mortgage by the party of the second part. . . ."

I am unable to concur in the legal wizardry by which this clause can be interpreted to mean, in case of a future indebtedness by either mortgagor to the bank, that the mortgage against the mortgaged premises is not security for such indebtedness. The desire to accomplish an equitable result is understandable, but I disapprove of the court modifying and remaking the contract.

I am authorized to state that Mr. Justice HALLOWS joins in this dissent.