Gerhart E. SCHMITZ and Leona F. Schmitz, his wife, Plaintiffs,

v.

George E. GRUDZINSKI, Agristor Leasing Company, and Strassburg Brothers Implement Company, Inc., Defendants,

IXONIA STATE BANK, Defendant-Appellant,

LEBANON STATE BANK, Defendant-Respondent.†

Court of Appeals

*No. 86–1345. Submitted on briefs July 15, 1987.—Decided October 8, 1987.*

(Also reported in 416 N.W.2d 639.)

---

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

---

For the appellant the cause was submitted on the briefs of *Thomas D. Georgeson* and *Brendemuehl & Georgeson,* of Oconomowoc.

For the defendant-respondent the cause was submitted on the brief of *Thomas J. Levi* and *Dierker, Bender & Levi, S.C.,* of Watertown.

Before Dykman, Eich and Sundby, JJ.

DYKMAN, J.   Ixonia State Bank appeals from an order directing a surplus in a land contract foreclosure to be paid to the Lebanon State Bank. Ixonia asserts that it is entitled to the surplus because its real estate security agreement (RESA) is senior to Lebanon's interest in the property. We agree, and reverse.

George Grudzinski purchased a farm on land contract in 1977. He was operating the farm with his son, Anthony, on July 7, 1981, when they borrowed about $12,000 from the Ixonia State Bank.[1] On July 31, 1982, George and Anthony borrowed about $5,600 from Ixonia. Both loans were secured by personal property. On February 28, 1983, George borrowed $9,000 from Ixonia. This time, the bank required that George give a RESA on the farm. The RESA, Wisconsin Banker's Association Form 238, provided:

> [T]he undersigned ... [customer] [g]rants Lender a continuing lien on the Property to secure all debts, obligations and liabilities of any Customer to Lender arising out of credit previously granted, credit contemporaneously granted or credit granted in the future by Lender to any Customer, to any

---

[1]George's wife, Dianne, also signed the July 7, 1981 note. The parties note that Dianne subsequently died.

Customer and another, or to another guaranteed or endorsed by any Customer....

On December 12, 1983, George borrowed $36,500 from Lebanon State Bank, and assigned to Lebanon his vendee's interest in his land contract as security.[2]

None of the notes were ever paid, and George subsequently filed a petition in bankruptcy. He also failed to make required payments on the land contract, resulting in its foreclosure. The sheriff's sale produced a surplus of about $4,000.[3] Both Ixonia and Lebanon contend that they are entitled to the surplus.

The trial court held an evidentiary hearing to determine which bank was entitled to the surplus. An officer of the Lebanon State Bank testified that when he was contemplating the December 12, 1983 loan to George, he ordered a title search which revealed Ixonia's RESA. Because a RESA does not show the sum of money it secures, the officer called Ixonia, and asked for the balance remaining on the RESA. Although the officer could not remember the person at Ixonia with whom he spoke, his notes of the conversation show that he was told that George owed Ixonia about $9,300 and Anthony owed Ixonia about $18,500. The officer interpreted this to mean that the RESA secured only the $9,000 loan.

The trial court concluded that because the RESA did not use clear language to describe the obligations it secured, Ixonia did not regard the agreement as

---

[2]This loan was in part an extension of new credit, and in part a re-write of previous loans.

[3]A larger surplus originally existed, but the parties stipulated to the disposition of all but about $4,000. Both banks' claims exceed $4,000.

security for the notes of July 7, 1981, and July 31, 1982.

We need not consider the trial court's findings of fact, because the interpretation of a written agreement is a question of law to which we owe no deference to the trial court. *Kreinz v. NDII Securities Corp.*, 138 Wis. 2d 204, 216, 406 N.W.2d 164, 169 (Ct. App. 1987). If a contract's terms are plain and unambiguous, we will construe the contract without considering how the parties might have construed it. *Id.* Whether a contract is ambiguous is also a question of law which we review *de novo. Capital Investments v. Whitehall Packing Co.,* 91 Wis. 2d 178, 189, 280 N.W.2d 254, 259 (1979). A contract is ambiguous when it is reasonably susceptible of more than one meaning. *Id.*

The provision in Ixonia's RESA which provides "Customer ... grants lender a ... lien ... to secure ... debts ... arising out of credit previously granted" is unambiguous. Though a mutual mistake of a bank and its debtor, or a bank's fraud or inequitable conduct may permit a real estate security agreement to be reformed, *State Bank of La Crosse v. Elsen,* 128 Wis. 2d 508, 513, 383 N.W.2d 916, 918 (Ct. App. 1986), Lebanon does not contend those facts are present here.

The trial court found that Ixonia and George did not intend to secure the July 7, 1981 and July 31, 1982, notes with the RESA. It inferred this finding from the information the Ixonia employee gave to Lebanon's officer: George owed Ixonia about $9,300 and Anthony owed Ixonia about $18,500, and from evidence that George and Anthony were co-makers on

the July 7, 1981, and July 31, 1982, notes while only George made the February 28, 1983, loan.

The difficulty with the trial court's reliance on this evidence is that the reason for introducing the evidence was to vary the terms of the RESA. As such, it was parol evidence, which may not be introduced for this purpose. *Stevens Construction Corp. v. Carolina Corp.,* 63 Wis. 2d 342, 354, 217 N.W.2d 291, 297 (1974). Parol evidence is inadmissible to vary or explain unambiguous written terms. *American Mut. Liability Ins. Co. v. Fisher,* 58 Wis. 2d 299, 304, 206 N.W.2d 152, 155 (1973). We have already concluded that the RESA unambiguously secured previously granted credit. The trial court was required to disregard the parol evidence of Ixonia's and George's intent. *See Conrad Milwaukee Corp. v. Wasilewski,* 30 Wis. 2d 481, 488, 141 N.W.2d 240, 244 (1966) (parol-evidence rule not so much rule of evidence as of substantive law. Trial courts therefore required to disregard parol evidence even if no objection made).[4] Therefore, the only

---

[4]Lebanon relies upon *State Bank of Hartland v. Arndt,* 129 Wis. 2d 411, 422, 385 N.W.2d 219, 224 (Ct. App. 1986) for the proposition that the parties' intent as to whether a RESA covers a particular advance is a finding of fact. While intent is a factual matter, *Arnold v. Shawano County Agr. Society,* 106 Wis. 2d 464, 469–70, 317 N.W.2d 161, 164 (Ct. App. 1982) *aff'd,* 111 Wis. 2d 203, 330 N.W.2d 773 (1983), the parol evidence rule prohibits a trial court from inquiring into the intent of parties to an unambiguous written agreement. The parties in *Hartland* did not raise the issue of the effect of the parol evidence rule on the debtors' contention that they did not intend a RESA to cover future advances. *Loy v. Bunderson,* 101 Wis. 2d 215, 222, 304 N.W.2d 140, 144 (Ct. App. 1981), *rev'd on other grounds,* 107 Wis. 2d 400, 320 N.W.2d 175 (1982). We usually decline to *sua sponte* consider an issue not raised on appeal. *State Bank of Hartland v. Arndt,* Wis. State Law

evidence of George's and Ixonia's intent was the RESA, which we have concluded is unambiguous.

Though relying on the trial court's finding as to George and Ixonia's intent, Lebanon also argues that the disputed RESA language constitutes a "dragnet" clause, disfavored in the law. *Capocasa v. First Nat. Bank,* 36 Wis. 2d 714, 722, 154 N.W.2d 271, 275 (1967). It concludes, as did the trial court, that because the two disputed notes were joint notes, while the note dated the same day as the RESA was George's alone, the RESA should not secure the disputed notes. Lebanon also contends it is significant that the disputed notes were secured by personal property when made, and were demand notes, while the February 28, 1983, note was secured by real estate and was a single payment note.

*Capocasa,* which the court noted was a case of first impression in Wisconsin as to the effect of "dragnet" clauses, examined other jurisdictions' opinions regarding these clauses. In *Capocasa,* the context was a mortgagor's contention that her co-mortgagor should not be permitted to further encumber her interest in real estate by his subsequent unilateral borrowings, though a "dragnet" clause in the joint mortgage permitted him to do so. The court agreed with the mortgagor. The focus in *Capocasa* was upon future advances made to one of two joint mortgagors. The court said:

> There seems to be no good reason for one who has executed a mortgage with [a] "dragnet" clause to

Library, 4811 *Appendices and Briefs.* We followed this rule in *Hartland.* We did not hold that a trial court may consider parol evidence to determine the intent of the parties to an unambiguous contract.

be permitted to escape its consequences for his personal borrowing merely because subjectively it was not within his contemplation (contrary to the words of the written instrument) that an additional obligation to the same creditor would subject his property to the "dragnet" feature of the mortgage.

. . . .

We conclude therefore that, when a "dragnet" clause is made a part of a mortgage executed by joint tenants, each mortgagor pledges his undivided interest in the mortgaged property to secure . . . (2) any existing or future individual indebtedness to the mortgagee . . . .

*Capocasa,* 36 Wis. 2d at 724 and 726–27, 154 N.W.2d at 276–77 and 278.

*John Miller Supply Co. v. Western State Bank,* 55 Wis. 2d 385, 394, 199 N.W.2d 161, 165 (1972) examined an art. 9 Uniform Commercial Code dragnet clause to determine whether that clause secured damages for future breaches of sales contracts. Though *Miller* is a Uniform Commercial Code case, and *Capocasa* involved a real estate mortgage, the *Miller* court used much the same method of analyzing the extent of a dragnet clause as did the court in *Capocasa.* The question in both cases was whether, as a matter of fairness or public policy, a dragnet clause would encumber property dissimilar to the property the parties originally contemplated as being subject to the dragnet clause.

Debts antecedent and debts subsequent to dragnet clauses in security devices require different analyses. In both cases, the policy is "no big surprises." However, in antecedent debt cases, the parties have knowledge of the debt and the security, and the question is whether the two are so wholly unrelated or

unclear that as a matter of public policy a court will refuse to enforce the clause as to specific security. Debts subsequent to dragnet clauses are unknown to the parties when the mortgage is given, though a future course of conduct may be contemplated. The similarity between future debts contemplated and future debts incurred is what a court scrutinizes when analyzing subsequent debt cases.

*Miller* quoted *National Bank of Eastern Arkansas v. General Mills, Inc.,* 283 F.2d 574 (8th Cir. 1960), as a fair summary of the rule to follow in art. 9 cases:

> The "other indebtedness" secured by a mortgage may be either antecedent or subsequent. Where it is antecedent it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred.

*Miller,* 55 Wis. 2d at 394, 199 N.W.2d at 165. Because this is a rule of policy, and does not depend upon factors unique to real estate or personal property, we conclude it is appropriate to use in analyzing any dragnet clause.

In the absence of testimony to the contrary, we assume that both Ixonia and George knew of George's prior indebtedness when on February 28, 1983, he approached Ixonia for more credit. Ixonia's officer testified that the proceeds of the two notes were used for George and Anthony's farm operation. Though the prior loans were secured by personal property, the additional $9,000 of credit made the total debt substantial, and in the absence of a RESA, the $9,000

would have been unsecured. Both George and the bank knew that George had only paid interest on the July 7, 1981 and the July 31, 1982 notes, and both must have known that George was increasing his indebtedness for the third consecutive year. The previously pledged collateral was one or two years older. There is no surprise in either the bank's request to become secured or in George's accession to that request. We conclude that the dragnet clause in the February 28, 1983 RESA includes the July 7, 1981 and the July 31, 1982 notes as secured obligations.

At the end of its evidentiary hearing, the trial court inquired whether estoppel might arise if Ixonia's employee had represented that the only debt secured by its RESA was in the amount of $9,000, and Lebanon relied on that representation when considering whether to extend credit to George. Ixonia's attorney acknowledged the possibility of estoppel, but maintained that Ixonia was entitled to a surplus as a matter of law. Lebanon's attorney did not respond to the trial court's inquiry. Neither bank's claim to the surplus suggests that an issue of estoppel existed. Each bank tried this case on the theory that under cases such as *Capocasa,* it was entitled to the surplus. Except as we have noted, neither bank claimed estoppel. The trial court did not address estoppel in its memorandum decision.

"We normally will not review an issue raised for the first time on appeal." *Marriage of Mathewson v. Mathewson,* 135 Wis. 2d 411, 418, 400 N.W.2d 485, 488 (Ct. App. 1986). Though Lebanon argues that equitable estoppel should be invoked against Ixonia, it does not directly address the issue the trial court suggested

might exist. We see no reason to depart from our normal rule.

*By the Court.*—Order reversed and cause remanded with instructions to issue an order disbursing the land contract foreclosure surplus to Ixonia State Bank.