Carole H. SCHMIDT, Plaintiff-Respondent,

v.

WAUKESHA STATE BANK, a Wisconsin banking corporation, Defendant-Appellant,

Byron R. LARSON, Third Party Defendant.

Court of Appeals

*No. 95–1850. Oral argument May 14, 1996.—Decided September 12, 1996.*

(Also reported in 555 N.W.2d 655.)

For the defendant-appellant there were briefs and oral argument by *Cramer, Multhauf & Hammes*, with *Richard R. Kobriger* of Waukesha.

For the plaintiff-respondent there were briefs and oral argument by *Michael, Best & Friedrich*, with *David A. Krutz* of Milwaukee.

Amicus Curiae brief was filed by *John E. Knight* and *James E. Bartzen* of *Boardman, Suhr, Curry & Field* of Madison, for The Wisconsin Bankers Association.

Before Fine and Schudson, JJ., and Michael T. Sullivan, Reserve Judge.

SCHUDSON, J.   Waukesha State Bank appeals from the judgment granting a declaratory judgment to Carole H. Schmidt, following a bench trial. The trial court concluded that the business note executed by Schmidt's ex-husband, Byron R. Larson, was not secured in whole or in part by the dragnet clause of the mortgage on their real property and, therefore, that Schmidt was not responsible for the debt under the note. The Bank argues that under both *Capocasa v. First National Bank*, 36 Wis. 2d 714, 154 N.W.2d 271 (1967), and Wisconsin's Marital Property Act, Schmidt is responsible for the debt.

We conclude that the trial court erred in applying *Capocasa* to the facts it found. We further conclude that the trial court erred by reversing the burden of proof under the marital property act and requiring the Bank to establish that Larson's business note was secured for the benefit of the marital interests. Accordingly, we reverse and remand for the trial court to make factual findings in order to determine whether the debt was incurred in the interest of the marriage and, in doing so, to apply the presumption that it was, as required by the marital property act.

## I.   FACTUAL BACKGROUND

Schmidt and Larson were married in 1986 and they purchased a duplex in 1990. As husband and wife, they executed a $10,000 consumer universal note secured by a mortgage on the duplex in favor of Waukesha State Bank. The mortgage contained a "future advances" or "dragnet" clause, which provided:

> **5.   Mortgage as Security.** *This Mortgage secures* prompt payment to Lender of . . . (b) to the extend [sic] not prohibited by the Wisconsin consumer Act (i) any *additional sums which are in*

*the future loaned by Lender to any Mortgagor,* to any Mortgagor and another or to another guaranteed or endorsed by any Mortgagor primarily for personal, family or household purpose and agreed in documents evidencing the transaction to be secured by this Mortgage and (ii) all *other additional sums which are in the future loaned by Lender to any Mortgagor,* to any Mortgagor and another or to another guaranteed or endorsed by any Mortgagor . . . .

(Emphasis added.)

Among other provisions, the mortgage also stated:

**8. Mortgagor's Covenants. Mortgagor covenants:**

. . . .

(f) Conveyance. Not to sell, assign, lease, mortgage, convey or otherwise transfer any legal or equitable interest in all or part of the Property, or permit the same to occur without the prior written consent of Lender and, without notice to Mortgagor, Lender may deal with any transferee as to his interest in the same manner as with Mortgagor, without in any way discharging the liability of Mortgagor under this Mortgage or the Note;

. . . .

**19. Successors and Assigns.** The obligations of all Mortgagors are joint and several. This Mortgage benefits Lender, its successors and assigns, and binds Mortgagor(s) and their respective heirs, personal representatives, successors and assigns.

On December 26, 1991, Larson, without Schmidt's knowledge, executed a $7,500 business note with Waukesha State Bank. Larson and the Bank renewed the note four times in 1992, also without Schmidt's knowledge. On November 13, 1992, Larson executed a

quitclaim deed conveying to Schmidt his right, title and interest in the duplex. Subsequently, on February 17, 1993, Larson, again without Schmidt's knowledge, executed a new note, renewing the original $7,500 and obtaining an additional $4,500. Larson did not inform the Bank of the quitclaim conveyance. Sometime after Schmidt and Larson separated in March 1993, Schmidt learned that Larson had executed the notes on the property. Schmidt and Larson divorced in October 1993.

The Bank sought to recover the indebtedness created by the notes under the mortgage's dragnet clause. The trial court concluded, however, that the quitclaim deed was valid and, therefore, that "Larson did not have any interest, either through marriage or singularly, in the Real Property at the time he executed the Business Note of February 17, 1993." Further, having found that "[t]here is no proof that the proceeds of the Business Note did inure to the benefit of Ms. Schmidt or to the benefit of the real property," the trial court also concluded that Schmidt was "not responsible for the debt under the Business Note." The trial court explained: "Since the Business Note is not a marital obligation, the Bank cannot rely on the provisions of § 766.55(2)(b).[1] Rather, the Bank falls under the scope of § 766.55(2)(d)."[2]

---

[1] Section 766.55(2)(b), STATS., states: "An obligation incurred by a spouse in the interest of the marriage or the family may be satisfied only from all marital property and all other property of the incurring spouse."

[2] Section 766.55(2)(d), STATS., states: "Any other obligation incurred by a spouse during marriage, including one attributable to an act or omission during marriage, may be satisfied only from property of that spouse that is not marital

## II. ANALYSIS

### A. The Mortgage.

The express terms of the mortgage, standing alone, make both Schmidt and Larson responsible for the debt incurred by the business note.[3] The dragnet clause unambiguously provides that "all other additional sums which are in the future loaned by" the Bank to either Schmidt or Larson are secured by the mortgage. Paragraphs 8(f) and 19 further clarify that Schmidt and Larson are obligated jointly and severally and may not relinquish their responsibility by assigning legal interest in the duplex without written permission of the Bank. We must consider, therefore, whether the quitclaim deed and/or *Capocasa* alter what otherwise would be Schmidt's clear obligation.

### B. The Quitclaim Deed.

First, it is necessary to segregate the pre- and post-quitclaim indebtedness—the $7,500 note Larson executed before he quitclaimed on November 13, 1992, and the renewal of that loan together with the new $4,500 in the note of February 17, 1993.

Regarding the $7,500 pre-quitclaim indebtedness, we conclude that because the dragnet clause establishes contractual covenants between both Larson and the Bank and Schmidt and the Bank, and

---

property and from that spouse's interest in marital property, in that order."

[3] Larson did not contest the Bank's third-party complaint against him for foreclosure of the mortgage and, on September 19, 1994, the trial court entered judgment for the Bank against Larson for $16,355.46.

because the mortgage prohibits Larson from divesting his legal interest in the property, absent the Bank's written permission, Schmidt's obligation under the dragnet clause survives the quitclaim. Indeed, Schmidt cites no authority to support her argument that by quitclaiming his interest, Larson somehow absolved her interest in the property of the increased indebtedness by which he encumbered it before the quitclaim.

A quitclaim deed cannot cleanse property of encumbrances. It only releases the grantor's claim or interest in the property. *See Leimert v. McCann*, 79 Wis. 2d 289, 301, 255 N.W.2d 526, 532 (1977); *see also* 6A RICHARD R. POWELL & PATRICK J. ROHAN, POWELL ON REAL PROPERTY ¶ 897[1], at 81A-29-30 (1996). To allow the quitclaim deed to eliminate the security interest established under the dragnet clause would allow Schmidt to receive more than Larson was able to give. Because Larson owned the property subject to the dragnet clause, he could not quitclaim what he owned "bleached" of his "dragnetted," contractual obligations. As the Bank and the *amicus curiae* brief of the Wisconsin Bankers Association correctly argue, to allow quitclaim deeds to so affect separate third-party obligations would be to allow married persons or co-mortgagors to release the liability of parties to mortgages by giving quitclaim deeds and not informing the banks of the conveyances. This would then allow a married person or co-mortgagor who released legal interest in a property to obtain additional bank loans that would be unsecured. This, of course, is exactly the kind of subterfuge precluded by standard real estate mortgage provisions such as paragraph 8(f) in the mortgage executed by Schmidt and Larson.

434

Regarding the post-quitclaim indebtedness of $4,500, however, we must consider additional questions. Although the quitclaim violated paragraph 8(f) of the mortgage, was it still valid to eliminate Larson's interest in the property so that he could not further encumber the property? If so, was the $4,500 post-quitclaim note Larson's individual debt or did it still fall within the reach of the dragnet clause?

Sections 706.01(1) and (7), and 706.02(1)(f), STATS., specifically allow spouses, among other things, to alienate any interest in a homestead.[4] That statutory allowance, however, does not provide that spouses may alienate any interest in order to undermine or eliminate valid contractual obligations with an uninformed, non-consenting third party, particularly where a mortgage requires the third party's consent before any such alienation may occur.

Schmidt argues that the Bank had constructive notice that Larson had no interest in the property given that the quitclaim deed had been recorded and that a bank's only remedy if a quitclaim deed is allowed

---

[4] Contrary to the parties' arguments we see no ambiguity in or conflict between §§ 766.31(10) and 706.02(1)(f), STATS. Section 766.31(10) states that "[s]pouses may reclassify their property by . . . conveyance, as defined in s. 706.01(4), *signed by both spouses*." (Emphasis added.) Section 706.02(1)(f), however, requires that real property conveyances alienating any homestead interest of a married person be "signed, or joined in by separate conveyance, . . . *except conveyances between spouses*." (Emphasis added.) It is undisputed that the property is a homestead. Section 706.01(4), STATS., specifically mentioned in § 766.31(10), however, cross-references § 706.02. Thus, while § 766.31(10) discusses reclassification in general, § 706.02(1)(f) explicitly governs the formal requisites for *interspousal real* property conveyances alienating any homestead interests.

to defeat a dragnet clause is not to loan additional money. The Bank responds that because subsequent liens of indebtedness relate back to the mortgage via the dragnet clause, *see Bank of Barron v. Gieseke*, 169 Wis. 2d 437, 455, 485 N.W.2d 426, 432 (Ct. App. 1992), it is not required to perform a title search prior to advancing additional money to a mortgagor under a dragnet clause.

*First Interstate Bank v. Heritage Bank & Trust*, 166 Wis. 2d 948, 480 N.W.2d 555 (Ct. App. 1992), supports Waukesha State Bank's position. In *First Interstate Bank*, we specifically rejected the argument that a mortgagee with a future advances clause and without actual knowledge of intervening mortgagees should be charged with constructive notice via record title and should be required to do a title search or credit check before each advance in order to have priority. *See id.*, 166 Wis. 2d at 954-955, 480 N.W.2d at 558. Further, we again refer to paragraph 8(f). It requires not only that the Bank be informed, but also that the Bank give "written consent" before a legal interest can be alienated.

Thus, we conclude that although Larson's quitclaim may be valid to assign to Schmidt interests he otherwise might have in the duplex, it is not valid to alienate his legal interests in any way that would eliminate his or Schmidt's contractual obligations to the Bank under the mortgage.

C. *Capocasa.*

Although our analysis of the mortgage and quitclaim would seem to conclusively resolve this appeal, our analysis must continue in light of *Capocasa.*

In *Capocasa*, the supreme court concluded that a joint tenant/wife's interest in mortgaged property was not subject to a dragnet clause contained in a note executed by her estranged husband where the wife had no knowledge of the note and did not consent to subjecting the mortgaged property to this additional debt.[5] The supreme court acknowledged that the literal language of the dragnet clause would make the mortgage security for the husband's note, but explained "that the literal enforcement of the clause would result, under the circumstances, in the perpetration of an inequitable result not intended by the parties." *Capocasa*, 36 Wis. 2d at 720, 154 N.W.2d at 274.[6]

---

[5] In *Capocasa*, a husband and wife owned a hearing-aid business in which both were officers and 50% stockholders but the wife "had no part in the actual management of the company." *Capocasa*, 36 Wis. 2d at 716-717, 154 N.W.2d at 272. The business borrowed $2,000 from a bank under an unsecured note. The couple subsequently executed a $10,600 note and mortgage, which contained a dragnet clause, on their residence. *Id.*, 36 Wis. 2d at 717, 154 N.W.2d at 272-273. After the husband left the wife and stopped operating the business, the bank exchanged the $2,000 unsecured note of the defunct corporation for the husband's personal note. *Id.*, 36 Wis. 2d at 717, 154 N.W.2d at 273. The wife was never asked to consent to the note nor did she have any knowledge of the husband's note until the bank tried to collect on the note from the sale proceeds of the house. *Id.* The dragnet clause stated that it was security for the note "and also *such further sums of money which may be or become owing by the parties . . ., or any or either of them*, to the [bank]." *Id.*, 36 Wis. 2d at 720, 154 N.W.2d 274 (emphasis in original).

[6] Chief Justice Currie, joined by Justice Hallows, vehemently dissented, characterizing the majority opinion as "legal wizardry" and stating that "[t]he [majority's] desire to

The supreme court delineated the indebtedness a dragnet clause will secure:

> [W]hen a "dragnet" clause is made a part of a mortgage executed by joint tenants, each mortgagor pledges his undivided interest in the mortgaged property to secure (1) the joint indebtedness or other indebtedness specifically named in the instrument, and any existing or future *joint* indebtedness of the mortgagors to the mortgagee; (2) any existing or future individual indebtedness to the mortgagee; and (3) any future debt of his co-mortgagor which is known to him and to which he consents to be a lien upon his interest; provided (4), in addition, that whenever the proceeds or the benefits derived from the other mortgagor's contracting a further obligation inure to the enhancement of his interest, the "dragnet" clause will be construed to cover such indebtedness to the extent of that enhancement notwithstanding the fact that the mortgagor did not know of or consent to the indebtedness.

*Id.*, 36 Wis. 2d at 726-727, 154 N.W.2d at 278 (emphasis in original). Despite the wife's agreement to the dragnet clause in the mortgage, the supreme court applied the third and fourth *Capocasa* criteria and held that her interest in the mortgaged property was not subject to the bank's lien because she did not know or consent to the husband's loan and because the obligation did not benefit or enhance her interest in the property. Therefore, the court ruled, the bank's lien attached to only the husband's one-half interest and

accomplish an equitable result is understandable, but I disapprove of the court modifying and remaking the contract." Dissent, 36 Wis. 2d at 728, 154 N.W.2d at 278.

declared the wife's interest "free and clear of the bank's claim." *Id.*, 36 Wis. 2d at 727, 154 N.W.2d at 278.

*Capocasa* is distinguishable from the present case for two main reasons—the first, factual, favoring Schmidt; the second, legal, favoring the Bank.

First, in *Capocasa*, the dragnet clause was applied to the renewal of a debt originally incurred, with the wife/co-mortgagor's knowledge and consent, prior to execution of the mortgage containing the dragnet clause. In contrast, putting the quitclaim issue aside for the moment, here the Bank seeks to apply the mortgage's dragnet clause to secure a new, subsequent debt incurred without Schmidt's knowledge or consent. Thus, under *Capocasa*, Schmidt is in an even more sympathetic position than the spouse who prevailed in *Capocasa*. Second, however, *Capocasa* was decided before Wisconsin enacted Chapter 766, the marital property act. As we will explain, the presumption of § 766.55(1), STATS., favors the Bank.

■

*Capocasa* did nothing to undermine the essential validity of a mortgage dragnet clause. In fact, *Capocasa* reiterated that "[t]here is no doubt that mortgages to secure future advances serve a socially and economically desirable purpose," *see id.*, 36 Wis. 2d at 719 & n.1, 154 N.W.2d at 273 & n.1, and further, that "Wisconsin has long recognized that a mortgage can secure future advances and the lien of the mortgage will attach at the time of the mortgage even though the advances are made at a later date." *Id.*, 36 Wis. 2d at 719, 154 N.W.2d at 274.

To paraphrase the *Capocasa* criteria in application to this case, Larson and Schmidt each pledged his or her undivided interest in the duplex under the dragnet clause to secure: (1) joint or other indebtedness named

in the mortgage, and any present or future joint indebtedness to the Bank; (2) their existing or future individual indebtedness to the Bank (here, Larson's loans); (3) any future debt of one known to the other and consented to by the other as a lien upon his or her interest; and (4) in addition, with respect to either of them, any "further obligation[s]" to which one contracts that "inure to the enhancement" of the other's interest regardless of knowledge or consent (here, arguably, Larson's loans, unknown to Schmidt).

None of the first three *Capocasa* criteria encompasses Larson's loans: (1) they were not named in the instrument and, excluding any impact of the dragnet clause, they were not future *joint* indebtedness; (2) they were not Schmidt's future *individual* indebtedness and, as we will explain, they were not necessarily Larson's future individual indebtedness; and (3) they apparently were not future debts of Larson known to Schmidt and, as we will explain, although the loans certainly were known to Larson, they were not necessarily future debts of Schmidt. Thus, if Larson's notes were encompassed by the dragnet clause they would be so only because, under the fourth factor, they were "further obligation[s]" contracted by Larson, unknown to Schmidt, that "inure[d] to the enhancement of [Schmidt's] interest."[7]

---

[7] Schmidt also argues that Larson's notes were insulated from the effect of the dragnet clause because the Bank did not check the box in front of the clause from the notes stating: "Unless checked here, this Note is not secured by a first lien mortgage or equivalent security interest on a one-to-four family dwelling used as Maker's principal place of residence." The Bank correctly responds, however, that the mortgage containing the dragnet clause was a second mortgage and.

Still, the parties argue over whether the *Capocasa* criteria remain viable in light of Wisconsin's subsequently enacted marital property law. After all, in the second factor for example, the very concept of "individual indebtedness" would certainly be affected by the marital property law's modern view of whether, and under what circumstances a spouse may incur an indebtedness that is strictly "individual." As we will see, however, analysis of this case under *Capocasa* renders a dispositive question consistent with that posed under the marital property law.

D.   Marital Property Law.

Section 766.55(2)(b), STATS., states that " *[a]n obligation incurred by a spouse in the interest of the marriage* or the family may be satisfied only from all marital property and all other property of the incurring spouse." (Emphasis added.) Section 766.55(2)(d), STATS., however, states that " *[a]ny other obligation* incurred by a spouse during marriage, including one attributable to an act or omission during marriage, may be satisfied only from property of that spouse that is not marital property and from that spouse's interest in marital property, in that order." (Emphasis added.)[8] Thus, the issue is whether the Larson loans were

---

therefore was not a "first lien mortgage or equivalent security interest." Additionally, among the "Additional Provisions" on the back of the notes is: "This Note is secured by all existing and future security agreements and mortgages between Lender and Maker."

[8]As the Bank made clear at oral argument before this court, it is *not* seeking to hold Schmidt *personally liable* for the indebtedness. Rather, it is seeking to enforce the mortgage's dragnet clause against her marital property share of the property.

"obligation[s] incurred . . . in the interest of the marriage," under § 766.55(2)(b), or "other obligation[s]," under § 766.55(2)(d).

Thus, to determine whether the dragnet clause in this case encompassed Schmidt's responsibility for the loans Larson secured, the fact-finder must evaluate whether, under *Capocasa*, the loans "inure[d] to the enhancement of Schmidt's interest." If so, then the loans, under marital property law, were "obligation[s] incurred by [Larson] in the interest of the marriage." Accordingly, assuming *Capocasa* survives the enactment of the marital property act, under its fourth factor, whether "the proceeds or the benefits derived from [Larson's] contracting a further obligation inure to the enhancement of [Schmidt's] interest" is the critical issue in determining whether, under § 766.55(2)(b), STATS., the obligation was "incurred in the interest of the marriage or the family."

E.   The Marital Property Presumption.

"Whether a family purpose exists in connection with incurring an obligation is a question of fact." 2 KEITH A. CHRISTIANSEN ET AL., MARITAL PROPERTY LAW IN WISCONSIN § 6.3A, at 6-9 (2d ed. 1993). Section 766.55(1), STATS., provides that "[a]n obligation incurred by a spouse during marriage, including one attributable to an act or omission during marriage, is *presumed* to be incurred in the interest of the marriage or the family." (Emphasis added.) In its factual findings, however, the trial court stated: "There is no proof that the proceeds of the Business Note did inure to the benefit of Ms. Schmidt or to the benefit of the real property." The trial court thus reversed the presumption and burden of proof.

Larson's loans, incurred during the marriage, are "presumed to be incurred in the interest of the marriage or the family" and, therefore, it was Schmidt's burden to produce evidence to overcome the statutory presumption. *See* RULE 901.03, STATS.[9] Thus, once the bank established the basic fact that the loans to Larson were incurred during the marriage, it became Schmidt's burden to prove by a preponderance of the evidence that the loans to Larson under consideration were not incurred in the interest of the marriage or the family. Accordingly, we conclude that the trial court erred by failing to apply the statutory presumption that Larson's notes were in the interest of the marriage and thus could be satisfied from the real property.[10]

## III.  CONCLUSION

In summary, we conclude that the mortgage contained a valid dragnet clause and the quitclaim did not extinguish any interest secured by the dragnet.

---

[9] RULE 901.03, STATS., states:

**Presumptions in general.** Except as provided by statute, a presumption recognized at common law or created by statute, including statutory provisions that certain basic facts are prima facie evidence of other facts, imposes on the party relying on the presumption the burden of proving the basis facts, but once the basic facts are found to exist the presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence.

[10] Because we are reversing on the marital property presumption, we do not address the parties' arguments regarding estoppel and fraudulent conveyances. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663, 665 (1938) (only dispositive issue need be addressed).

Further, we conclude that *Capocasa*, when properly applied to this case, is consistent with the Wisconsin Marital Property Act. Therefore, we remand this matter to the trial court for its factual determinations with the correct application of the marital property presumption under § 766.55(1), STATS.

*By the Court.*—Judgment reversed and cause remanded.