MITCHELL BANK, Plaintiff-Appellant-Petitioner,

v.

Thomas G. SCHANKE †, Alfred G. Waltke, Marilyn
M. Waltke, State of Wisconsin Department of
Revenue and Internal Revenue Service,
Defendants-Respondents,

UNITED STATES, Defendant.

Thomas G. SCHANKE, Plaintiff-Respondent,

v.

MITCHELL STREET STATE BANK, n/k/a Mitchell Bank,
Defendant-Appellant-Petitioner.

Supreme Court

*Nos. 01–1590, 01–1591. Oral argument November 5, 2003.—
Decided February 27, 2004.*

2004 WI 13

(Also reported in 676 N.W.2d 849.)

---

† Motion for Reconsideration denied 4-22-04.

For Mitchell Bank there were briefs by *Hugh R. Braun, Jeffrey L. Janik* and *Godfrey, Braun & Frazier, LLP,* Milwaukee, and oral argument by *Hugh R. Braun.*

For Thomas G. Schanke there were briefs by *Joseph J. Welcenbach, Robert J. Welcenbach* and *Welcenbach & Widmann, S.C,* Milwaukee, and oral argument by *Joseph J. Welcenbach.*

There were amicus curiae briefs filed by *John E. Knight, James E. Bartzen, Kristen E. Spira* and *Boardman, Suhr, Curry & Field, LLP,* Madison, on behalf of the Wisconsin Bankers Association, and oral argument by *John E. Knight.*

¶ 1. JON P. WILCOX, J. This case involves two

consolidated actions: a foreclosure action and a declaratory judgment action. The parties dispute the validity of a mortgage Mitchell State Street Bank, now known as Mitchell Bank (the Bank), has on certain lands in Genesee, Wisconsin, of which Thomas Schanke (Schanke) owns an undivided one-half interest. Schanke purchased his interest following a previous successful action against Dr. Alfred Waltke (Waltke) to collect on an outstanding debt. Waltke's wife owns the other undivided one-half interest in the disputed property.

¶ 2. On March 7, 2000, Schanke, naming the Bank as a defendant, filed a declaratory judgment action in the Waukesha County Circuit Court, seeking a determination that the Bank's mortgage on the Genesee property was invalid. The Bank subsequently began a foreclosure action on August 9, 2000, with respect to the Genesee property, naming Waltke and his wife, among others, as defendants. The cases were consolidated and tried before the court on the foreclosure action.

¶ 3. This case comes to us on appeal from a published court of appeals decision, *Mitchell Bank v. Schanke*, 2002 WI App 225, ¶ 29, 257 Wis. 2d 723, 652 N.W.2d 636, affirming a judgment of the Waukesha County Circuit Court, Kathryn W. Foster, Judge, dismissing the foreclosure action after finding that the mortgage of the Bank on the Genesee property was invalid for lack of consideration. The court of appeals also held, as a matter of law, that the Bank failed to prove the underlying debt in the mortgage and that the "dragnet clause"[1] within the mortgage was unenforce-

---

[1] A "dragnet clause," also known as a "Mother Hubbard clause" or "anaconda clause," is "[a] clause stating that a

able. *Id.* For the reasons discussed below, we reverse the court of appeals' decision and remand for further proceedings.

## I. FACTS

¶ 4. The facts of these consolidated cases are largely undisputed, but they are also extremely complicated and somewhat incomplete. During the course of 1986 and 1987, Waltke executed several loans, guaranties, and mortgages with various creditors, including the Bank and Schanke.[2] These loans were both personal and business related. Sometime during 1987 or 1988, Waltke became insolvent and later declared bankruptcy; he defaulted on nearly all of his loans.

### A. The Mortgage at Issue

¶ 5. On May 7, 1987, Waltke and his wife Marilyn executed a real estate mortgage on 34 acres of non-homestead property in Genesee, Wisconsin. The May 7 mortgage (the Mortgage) was a preprinted form that was originally prepared to have been executed on May

mortgage secures all the debts that the mortgagor may at any time owe to the mortgagee." *Black's Law Dictionary* 1031 (7th ed. 1999). Paragraph four of the Mortgage in this case is such a clause.

[2] The Wisconsin Department of Revenue and the Internal Revenue Service, two of the four respondents in this action, have liens on the Genesee property, but both have conceded the priority of the Bank's Mortgage. They did not play any role in the trial of these cases. The Waltkes, the remaining respondents, did not answer the Bank's complaint.

14, 1987.[3] The Mortgage was not recorded until June 2, 1987. This Mortgage is the subject of the parties' respective actions.

¶ 6. The face of the Mortgage states that it was given in consideration for a $50,000 promissory note (the Note), also dated May 7, 1987, in favor of the Bank. The Note is missing; however, the record clearly indicates that no money was disbursed to Waltke on May 7, 1987. The Bank asserts that this Note was a renewal of a September 4, 1986, loan, while Schanke argues that the Mortgage was a fraudulent transfer.

¶ 7. The Bank asserts that the Note, along with countless other documents, was destroyed in a flood of the Bank's basement. The circuit court found it was plausible that a flood destroyed the Note, although Schanke contested this explanation. Accordingly, the controversy between the Bank and Schanke arises from the missing Note.

¶ 8. Waltke had many other transactions with the Bank, including two related notes that were executed in the months leading up to May 7, 1987. Waltke signed the first of those notes on September 4, 1986. This $50,000 note in favor of the Bank was due December 3, 1986, and was secured by a printing press. This was a new loan; the record shows Waltke received a $50,000 cashier's check on September 4, 1986. The Bank claims that this note was renewed in December 1986 for another 90 days, to be due in early March.[4]

¶ 9. As for the second note, the record shows that on March 3, 1987, Waltke renewed the $50,000 Septem-

---

[3] Since no one who was directly involved with any of Waltke's transactions with the Bank testified at trial, we do not know why the parties executed this Mortgage a week early.

[4] This note, like the May 7 Note, is missing.

ber 4 note for another 90 days. This new note was due June 1, 1987, and states that it was a renewal of the September 4 note, but does not reflect that it was secured by any collateral.[5]

¶ 10. The Bank claims that the May 7 Mortgage and Note were a renewal and restructuring of the March 3 renewal note; the May 7 Note renewed the loan period, and the May 7 Mortgage secured the $50,000 debt in the March 3 renewal note. It is likely that, on its face, the May 7 Note would reveal whether it was, in fact, a renewal of the March 3 note.

B. Waltke's Indebtedness to Schanke

¶ 11. During all of his dealings with the Bank, Waltke was also in debt to Schanke. Waltke signed a $20,000 note in favor of Schanke on March 10, 1986, which was due September 9, 1986. Waltke never made any payments on this debt, and Schanke filed suit against Waltke on April 9, 1987, to collect on the note. He served process on Waltke on April 13, 1987. Waltke's answer was due May 4, 1987, three days before he executed the Mortgage at issue in this case.

¶ 12. Waltke did not contest the suit with Schanke and on May 19, 1987, the presiding judge awarded Schanke a default judgment. Schanke purchased a half interest in the Waltkes' Genesee property

---

[5] Mr. Croke, the Bank's vice president and the only witness at trial, testified that the March 3 note was unsecured. He also testified at his deposition that the September 4 note was secured by the printing press and that the March 3 note renewed the September 4 note.

at a sheriff's sale on June 13, 1998. This is the same property that is the subject of the Mortgage with the Bank.[6]

C. Waltke's Unpaid Obligations to the Bank

¶ 13. There is no dispute that Waltke never repaid the $50,000 loan taken out on September 4, 1986. In December of 1988, Waltke declared bankruptcy. About this time, under the instruction of the FDIC, the Bank "wrote off" this $50,000 debt and the rest of Waltke's outstanding obligations as "legal bad debts."[7] Waltke's end-of-the-year account statement from the Bank for 1988 demonstrates that until December 2, 1988, he owed the Bank $50,000 in principal and a considerable amount in interest. The Bank's general ledger reflects that on December 2, 1988, it charged Waltke's $50,000 debt to its reserve account as a loss to the Bank. Around this time, the Bank also posted a letter to the FDIC

---

[6] Curiously, the Mortgage was recorded prior to Schanke obtaining an interest in the Genesee property. A title report dated June 30, 2000, states that the May 7 Mortgage was recorded on June 2, 1987. The title report describes the Mortgage as follows:

> Mortgage, according to the terms and provisions thereof, from Alfred G. Waltke and Marilyn M. Waltke, his wife, to Mitchell Street State Bank, to secure the originally stated indebtedness of $50,000 and *any other amounts payable under the terms thereof,* dated May 7, 1987 and recorded on June 2, 1987 as Document No. 1426917.

(Emphasis added.)

[7] When a lending institution "writes off" a "bad debt," it is merely indicating that the debt is uncollectible. That is, it is no longer an asset of the institution. A "write off" does not mean that the institution has forgiven the debt or that the debt is not still owing.

describing all of the bad debts it was writing off, including the $50,000 Waltke debt. The Bank's general ledger, the letter to the FDIC, and the Bank's end-of-the-year account statements demonstrate that Waltke owed an additional $42,000 in outstanding obligations as of December 1988.

¶ 14. Twenty-five thousand dollars of that debt stems from Waltke's personal guaranty of a $25,000 loan the Bank made to Gary Butler in the summer of 1986. Over the course of 1986, that note was renewed three times and no payments were ever made against it. The most recent due date for that loan was February 2, 1987, about a month before Waltke's September 4, 1986, $50,000 note was due.

¶ 15. A smaller portion of Waltke's unpaid obligation to the Bank came from his personal guaranty of a May 29, 1986, $15,000 loan to Miracle Shield International, Inc., a Waltke business interest. The record demonstrates that Waltke and other individuals guaranteed this loan and that some payments were made against it during the summer and fall of 1986. Waltke's personal guaranty of this note was limited to $5,000 and therefore the Bank does not claim interest against this sum.[8]

¶ 16. The remaining $12,000 of Waltke's total unpaid obligations to the Bank as of December 1988 came from his personal guaranty of a $50,000 note to another business interest, Universal Graphics Services, Inc. The Universal Graphics loan originated on Novem-

---

[8] Confusingly, the Bank does not explain why it is claiming interest upon the Butler debt ($25,000), as Waltke had executed a personal guaranty for that note that was limited to $25,000.

ber 3, 1986, and established a master line of credit for the business, which was secured by Waltke's personal guaranty.

¶ 17.　This note was renewed on February 3, 1987, in the sum of $45,271.98. Apparently, some payments had been made against this note. Also, upon renewal, Waltke secured the note with a real estate mortgage on his Grand Avenue property in Waukesha. The face of the mortgage recites that it was granted in consideration for a $145,271.98 note. Mr. Croke, the Bank's vice president and chief financial officer, testified that this entire sum was probably made available to Universal Graphics for incremental disbursements, although only $45,271.98 had been actually drawn out as of February 1987.

¶ 18.　The subsequent disposition of the Grand Avenue mortgage is not clear from the record.[9] The record shows that the most recent amount owed on the Universal Graphics debt was $45,271.98, the entire sum of the February 3 renewal note. On December 2, 1988, the Bank wrote off the Universal Graphics debt in the amount of $12,000. The Bank stated in its letter to the FDIC that as of November 29, 1988, the *only* security the Bank had for *all* of Waltke's obligations was his personal guaranty and a lien on a printing press.[10]

¶ 19.　The Bank recovered the written-off $12,000 Universal Graphics debt in July of 1989 upon the foreclosure and sale of one of Waltke's printing

---

[9] At trial, Mr. Croke testified that he had never seen this mortgage before and that he did not know what happened to it.

[10] Conspicuously, the May 7 Mortgage was also absent from the letter to the FDIC.

presses.[11] The press was originally appraised with a value of $133,000, but was sold for only $25,000. The Bank satisfied the remaining Universal Graphics debt from this $25,000 and the remaining $13,000 was applied to Waltke's September 4, 1986, personal $50,000 loan. Therefore, the Bank claims that Waltke owes nothing on the Universal Graphics loan and only owes $37,000 in principal (though some $75,041.43 in interest) on the September 4, 1986, $50,000 personal loan. In sum, the Bank claims that Waltke owes $67,000 in principal and over $125,000 in interest for his personal note and his guaranties of the Butler and Miracle Shield loans.[12]

[11] The September 4 note to Waltke was secured by a printing press. At trial, Mr. Croke testified that Waltke had mortgaged more than one printing press and that the presses were associated with the Universal Graphics business. However, the Bank foreclosed on only one of these presses because it improperly filed lien perfections against the other presses. Mr. Croke was unsure whether the press that the Bank actually acted upon was the same press that secured the September 4 note.

[12] In summary, the Bank calculates Waltke's unpaid obligations as follows:

| Note/Guarantee | Principal | Interest | Total |
| --- | --- | --- | --- |
| Alfred Waltke | $37,000 | $ 75,041.43 | $112,041.43 |
| Gary Butler | $25,000 | $ 49,739.67 | $ 74,739.67 |
| Miracle Shield | $ 5,000 | $ 0.00 | $ 5,000.00 |
| Universal Graphics | Recovered | n/a | zero |
| TOTAL: | $67,000 | $124,781.10 | $191,781.10 |

*Mitchell Bank v. Schanke,* 2002 WI App 225, ¶ 9 n.3, 257 Wis. 2d 723, 652 N.W.2d 636.

## II. PROCEDURAL POSTURE

¶ 20. As noted, these two cases were consolidated before trial. The Waltkes filed a notice of appearance but never answered the Bank's complaint. At the joint trial, the only witness was Mr. Croke, the Bank's vice president and chief financial officer. Schanke never took the stand and did not call any witnesses. After the trial, the circuit court orally dictated its findings of fact and conclusions of law. The circuit court concluded that because the Note could not be produced "the Mortgage be released as a matter of law as there is no consideration granted for the Mortgage of May 7, 1987 . . . without a concurrent note. . . . " The circuit court also found that the Mortgage was intended to secure only the $50,000 missing Note and that because the parties did not intend to secure the other obligations and the Note could not be produced, the "Mortgage ceases to exist as a matter of law. . . . " Finally, the circuit court concluded that the dragnet clause was unenforceable.

¶ 21. The court of appeals affirmed, stating, "[t]he Mortgage is invalid because the Note cannot be produced and Mitchell Bank cannot establish the indebtedness secured by the Mortgage." *Mitchell Bank,* 257 Wis. 2d 723, ¶ 29. The court of appeals also determined that the dragnet clause was invalid because "if the amount of debt is not both stated in the mortgage and identifiable from the mortgage documents, the mortgage is not enforceable." *Id.,* ¶ 27. Mitchell Bank appealed and we accepted review. After the parties submitted briefs and oral argument was completed, we asked the parties to provide supplemental briefs and oral argument to address several controlling issues not raised in their original materials.

## III. ISSUES

¶ 22. Whether the Bank's Mortgage is enforceable is dependent upon the following issues: 1) whether there was consideration for the Mortgage; 2) whether Mitchell Bank proved the debt underlying the Mortgage; and 3) whether the dragnet clause contained in the Mortgage is enforceable. We hold that because the Mortgage is an executed contract and is under seal, consideration for the Mortgage was conclusively presumed, and the circuit court erred in finding to the contrary. Second, we hold that the Bank did prove the debt underlying the Mortgage, despite the Bank's failure to produce the Note, because the parties intended the Mortgage to secure antecedent debt and the Bank proved the existence of extensive antecedent debt. Finally, we hold that the dragnet clause contained in the Mortgage, which secured this antecedent debt, is valid because it clearly states that it secures antecedent debt and the debt and the security are not wholly unrelated or unclear. Therefore, we reverse the decision of the court of appeals and remand for a determination of the exact amount of debt owed to the Bank.

## IV. ANALYSIS

A. Consideration for the Mortgage

██

¶ 23. As noted, the circuit court ruled that because the Bank could not produce the Note, the Mortgage failed as a matter of law for want of consideration. *Mitchell Bank,* 257 Wis. 2d 723, ¶ 18. Although the court of appeals did not expressly rely on this finding, it implicitly did so in affirming the circuit court. *Id.,* ¶ 29. The parties did not originally address the consideration

issue; however, this was one of the issues that we asked the parties to address in their supplemental briefs and argument to this court.

██

¶ 24. We review legal conclusions of the circuit court de novo. *See First Nat'l Leasing Corp. v. City of Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). The May 7 Mortgage was signed by both of the Waltkes with "(seal)" printed after both of their names.[13] Under Wisconsin law, when an executed contract is signed under seal, the seal is conclusive proof of consideration, and consideration may not be impeached absent a factual showing of fraud.

> [A] seal imports consideration for the mortgage. This imports consideration for the note also. In absence of allegations of fact showing fraud the mortgage cannot be impeached for want of consideration.
>
> . . . .
>
> However, because, as we have concluded, the executed mortgage did not constitute an executory instrument as contended by appellant, the trial court was correct in concluding that fraud must be alleged and proven in order to defend against foreclosure upon the grounds of lack of consideration. The seal was conclusive as to the issue of consideration.

*Sec. Nat'l Bank v. Cohen,* 41 Wis. 2d 710, 719, 165 N.W.2d 140 (1969)(citing *Virkshus v. Virkshus,* 250 Wis. 90, 93, 26 N.W.2d 156 (1947)). *See also Hoffmann v.*

---

[13] Wisconsin Stat. § 990.001(37) (1985–86) provides: "Except for the sealing of instruments by persons required to have and use official seals, 'seal' includes the word 'seal,' the letters 'L S' and a scroll or other device intended to represent a seal, if any is affixed in the proper place for a seal . . . ." The Mortgage was also notarized.

*Wausau Concrete Co.,* 58 Wis. 2d 472, 486–87, 207 N.W.2d 80 (1973) (ruling that the presence of a seal establishes consideration when the contract has been executed but creates merely a presumption of consideration when the contract is executory); *Edwards v. Petrone,* 160 Wis. 2d 255, 258–59, 465 N.W.2d 847 (Ct. App. 1990) (holding that "an executed contract under seal [is] conclusive proof of consideration . . . . [T]here is a conclusive presumption as to consideration which is afforded to executed contracts under seal").

¶ 25. In contrast, Wis. Stat. § 891.27 (1985–86) provides: "A seal upon an executory instrument shall be received as only presumptive evidence of a sufficient consideration." *See also Frank v. Schroeder,* 239 Wis. 159, 162, 300 N.W. 254 (1941) (noting "[a] seal is conclusive of consideration only in the case of executed contracts."); *Singer v. Gen. Acc., Fire & Life Assur. Corp.,* 219 Wis. 508, 511, 262 N.W. 702 (1935) (stating that "[a]n executed contract under seal conclusively imports consideration, and is to be distinguished from an executory contract, with respect to which . . . a seal shall be merely presumptive evidence of consideration").

¶ 26. The Bank contends that the Mortgage is an executed contract under seal and Schanke never proved fraud, such that the circuit court committed legal error in concluding that the Mortgage failed for lack of consideration. Schanke contends that while most mortgages constitute executed contracts, the Mortgage in question is executory because the Bank never advanced any money the day the Mortgage was signed and could not produce the Note. Thus, the effect of the seal on the Mortgage is dependent upon whether the Mortgage constituted an executed or executory contract.

¶ 27. "An executory contract is one in which the parties have bound themselves to future activity that is not yet completed, while an executed contract is one in which all promises have been fulfilled and nothing remains to be done." *Gaugert v. Duve,* 217 Wis. 2d 164, 178, 579 N.W.2d 746 (Ct. App. 1998). *See also Blacks Law Dictionary* 321 (7th ed. 1999) (defining an executed contract as follows: "1. A contract that has been fully performed by both parties. 2. A signed contract."). In the absence of proof that a mortgage is contingent upon the happening of a future event, a signed mortgage is an executed contract. *Sec. Nat'l Bank,* 41 Wis. at 718.

¶ 28. In *Sec. Nat'l Bank,* the appellant contended that the mortgage in question was executory, as it was conditioned on the return of certain insurance policies. *Id.* at 716–17. The court found that there was no evidence to suggest that the giving of the mortgage was so conditioned. *Id.* at 718. Therefore, the court concluded that the mortgage was not executory and that the defendant could not defend against foreclosure on the ground of want of consideration because the mortgage was under seal and the defendant had not proven fraud. *Id.* at 719.

¶ 29. Here, there is absolutely no evidence that the Mortgage was conditioned upon the happening of some future event. The Mortgage was signed, delivered, and recorded. It is a complete contract; both parties fully performed and nothing was left to be done. The fact that Waltke was required to make payments on the loan does not render the contract executory. *See Edwards,* 160 Wis. 2d at 258 (ruling that a signed promissory note was not rendered an executory contract

merely because it required the debtor to make payments). Therefore, the Mortgage is an executed contract.

¶ 30. Schanke's argument that the Mortgage is executory because no money changed hands the day the Mortgage was signed is without merit. A mortgage may lawfully be given in consideration for the extension of time to repay a debt,[14] or to secure a renewal note evidencing pre-existing debt.[15] However, we need not deduce the exact form of consideration here; consideration is conclusively established because the Mortgage is an executed contract under seal.

¶ 31. Schanke further argues that even an executed contract under seal may be challenged for failure of consideration if one party never performs. However, this contention was squarely addressed in *Singer*. The issue in *Singer* was whether "one who has executed under seal a release of a cause of action for the purpose of compromising a dispute may rescind the contract of release upon a breach constituting a failure of consideration." *Singer*, 219 Wis. at 510. The court held that because the release was executed under seal, the validity of the instrument could not be attacked by inquiring into consideration. *Id.* at 511. Noting that the delivery of the release was not conditional, the court applied the rule that "[a]n executed contract under seal conclusively imports consideration." *Id.* at 511. The court stated that "[t]he conclusive presumption of consideration, or, somewhat more realistically stated, the fact that no consideration is required for its validity, com-

---

[14] *Kellogg-Citizens Nat. Bank of Green Bay v. Francois*, 240 Wis. 432, 436–37, 3 N.W.2d 686 (1942).

[15] *Cremer v. Banking Comm'n*, 224 Wis. 174, 177, 272 N.W. 40 (1937).

pels this conclusion." *Id.* The court then discussed the application of this rule to deeds of conveyance:

> "In our ordinary deeds of conveyance the recital that there has been paid a consideration, and what that consideration was, is merely a statement of a fact theoretically necessary to exist in order that the conveyance might take effect, but which early became practically a mere immaterial fiction by reason of the rule that the grantor's seal raised a conclusive presumption of a consideration sufficient to support the instrument. Hence one cannot deny existence of some consideration in order to defeat the conveyance."

*Id.* (citation omitted).

██

¶ 32. While certainly this court would not allow a creditor to recover sums from a debtor if the creditor never advanced the money, Schanke's argument is more germane to the requirement that the mortgagee prove the existence of debt in order to foreclose on the mortgage, as a mortgage cannot exist without a debt. *See Doyon & Rayne Lumber Co. v. Nichols,* 196 Wis. 387, 390, 220 N.W. 181 (1928). Thus, while a mortgagee will not be able to foreclose upon the mortgage if there is no debt, the law still conclusively presumes consideration for an executed mortgage that was signed under seal.

██ ██

¶ 33. Schanke is essentially attempting to dress up his fraudulent conveyance argument in new clothes. However, the circuit court declined to find that the Mortgage represented a fraudulent conveyance. Notably, the Waltkes themselves have never alleged that the

Bank did not perform or that they are not liable.[16] In fact, the Waltkes have in essence admitted the validity of the Mortgage by failing to deny any of the allegations contained in the Bank's complaint. Wisconsin Stat. § 802.02(4) (1999–2000) provides that "[a]verments in a pleading to which a responsive pleading is required, other than those as to the fact, nature and extent of injury and damage, are admitted when not denied in the responsive pleading . . . ." We agree with the Bank that as defendants in the foreclosure action, the Waltkes were required to file an answer. The Waltkes' failure to do so thus results in their admission of all the facts alleged in the Bank's complaint.

¶ 34. Schanke contends the Waltkes' failure to answer cannot be deemed an admission because the Bank never received a default judgment and under *Chetek State Bank v. Barberg,* 170 Wis. 2d 516, 523, 489 N.W.2d 385 (Ct. App. 1992), a party may not recover when a claim is not recognized by law, even if the other party is in default. However, § 802.02(4) does not require that a court enter a default judgment. The Waltkes were required to answer the Bank's complaint; they failed to do so. Under § 802.02(4), the Waltkes are deemed to admit any allegation they did not deny. As such, they admitted all allegations contained therein. The Waltkes have never challenged or contested the validity of the Mortgage themselves.

¶ 35. We conclude that the Mortgage at issue was an executed contract, not an executory contract. The contract was under seal. Schanke did not put in any evidence, nor did the circuit court find as a matter of

---

[16] Once a party executes a contract, he is bound by it, and can no longer contend that the contract is void for lack of consideration. *See Gaugert v. Duve,* 217 Wis. 2d 164, 178, 579 N.W.2d 746 (Ct. App. 1998).

fact, that the Mortgage was fraudulent. Therefore, consideration for the Mortgage was conclusively established. The circuit court erred in concluding that as a matter of law the Mortgage failed for lack of consideration.

## B. Proof of the Underlying Debt

¶ 36. We next address the issue of whether the circuit court and court of appeals erred in determining that the Bank had failed to prove the debt underlying the Mortgage. The court of appeals ultimately upheld the circuit court's conclusion that the Mortgage was invalid because the Bank had failed to prove the existence of the debt underlying the Mortgage. *Mitchell Bank,* 257 Wis. 2d 723, ¶¶ 18, 25. The circuit court concluded that because the Bank could not produce the Note and could not prove the existence and contents of that Note—the $50,000 debt referenced in the Mortgage—the Mortgage was invalid for failure of the Bank to prove the underlying debt. *Id.,* ¶ 18.

██ ██

¶ 37. In order to foreclose on the Mortgage, the Bank was required to prove the existence of the underlying debt that the Mortgage secured. "Where there is no debt—no relation of debtor and creditor—there can be no mortgage." *Doyon & Rayne Lumber Co.,* 196 Wis. at 390 (internal quotation and citation omitted). Schanke contends that the evidence overwhelmingly supports the circuit court's conclusion that the Bank failed to prove the existence of the May 7 Note, while the Bank contends that the evidence demonstrates that the missing Note was the latest in a series of renewal notes, securing the September 1986, $50,000 obligation.

¶ 38. This issue is complicated as a result of the presence of the dragnet clause, which purports to

secure all outstanding antecedent debt. One of the issues we asked the parties to address in their supplemental materials was whether "proof of a valid dragnet clause, by itself, [is] sufficient to validate a mortgage when there is no proof of underlying debt other than the antecedent debt secured by the dragnet clause[.]" Both Schanke and the Bank concede that if a mortgage contains a valid dragnet clause and proof is made as to the specific amount of debt secured thereby, the mortgage is valid. Schanke contends that the mortgage must also clearly recite the past consideration and state a specific amount of antecedent debt. Schanke further contends that the mortgage must be executed in good faith.

¶ 39. However, Schanke fails to substantiate these "requirements" with citation to case law. His contention that the mortgage must clearly state that it secures antecedent debt and specifically state the amount is more appropriately directed at the question of what is required for a dragnet clause to be enforceable in the first instance. Likewise, his "good faith" requirement is merely an attempt to persuade this court to consider his fraudulent transfer argument, which was not established at the circuit court.

¶ 40. We conclude that a legally enforceable dragnet clause can by itself validate a mortgage when there is proof of the underlying antecedent debt secured by the dragnet clause and the mortgage clearly indicates that the parties intended for the mortgage to secure antecedent debt. This is perfectly logical because the bank has the burden of specifically proving the underlying debt secured by the mortgage. *Capocasa v. First Nat'l Bank*, 36 Wis. 2d 714, 720, 154 N.W.2d 271 (1967).

¶ 41. The parties to this litigation focus on the missing Note and whether the Bank needed to produce the Note to foreclose. The circuit court, the court of appeals, and the parties all speak of the Mortgage as "securing the $50,000 note." Yet, this is an improper use of terminology. "A mortgage, secures the debt, not the note, bond, or other evidence of the debt, while the note represents, and is the primary evidence of, the debt." 59 C.J.S. *Mortgages* § 143 (1998). What matters is the debt itself, not the Note. Thus, the proper inquiry is whether the Bank failed to prove the debt secured by the Mortgage.

¶ 42. The Mortgage in question here secures two categories of debts. First, it secures the $50,000 debt evidenced by the missing Note. Second, the Mortgage, via the dragnet clause, purports to secure all antecedent debt owed by the Waltkes to the Bank. With respect to the first category—the debt evidenced by the Note—the Bank was not required to produce the Note in physical form, if it could establish the Note's existence, terms, and conditions through other evidence, or otherwise establish the existence of outstanding debt secured by the Mortgage. *See, e.g., New England Savs. Bank v. Bedford Realty Corp.,* 680 A.2d 301, 310 (Conn. 1996) (finding that the loss of a promissory note supporting a mortgage was not fatal to foreclosure action). "In Wisconsin, the cause of action on a note evidencing an indebtedness and the cause of action to foreclose the mortgage on real estate that secures the indebtedness are distinct." *Bank of Sun Prairie v. Marshall Dev. Co.,* 2001 WI App 64, ¶ 12, 242 Wis. 2d 355, 626 N.W.2d 319. Thus, in the context of a mortgage foreclosure action:

A bill or note is not a debt; it is only primary evidence of a debt; and where this is lost, impaired or destroyed bona fide, it may be supplied by secondary evidence. The loss of a bill or note alters not the rights of the owner, but merely renders secondary evidence necessary and proper.

*New England Savs. Bank,* 680 A.2d at 310 (internal citations & quotations omitted). *See Bank of Sun Prairie,* 242 Wis. 2d 355, ¶¶ 17–19 (implying that where an outstanding debt has been reduced to a judgment, the judgment can serve as proof of the debt secured by the mortgage).

██

¶ 43. Therefore, it matters not whether the Note itself is produced, as long as the Bank can prove the underlying debt secured by the Mortgage: " 'A mortgage is only an incident to a debt, which is the principal thing.' " *Doyon & Rayne Lumber Co.,* 196 Wis. at 390 (quoting *Cawley v. Kelley,* 60 Wis. 315, 319, 19 N.W. 65 (1884)) *See also Sec. Nat'l Bank,* 41 Wis. 2d at 715–16 (concluding that the fact that a note was not executed was immaterial when the mortgagee proved the existence of the underlying debt described in the mortgage); *Badger State Agri-Credit & Realty, Inc. v. Lubahn,* 122 Wis. 2d 718, 724, 365 N.W.2d 616 (Ct. App. 1985) (stating that "[e]xtrinsic evidence may be used to ascertain and prove the debt"). Thus, even if the Bank could not produce the Note and did not establish its terms via secondary evidence, this simply means that they did not prove the existence of the $50,000 debt stated on the face of the Mortgage. However, even if the Bank did not prove the $50,000 debt referenced in the missing Note, the Bank can still foreclose if it proved that the Mortgage secured antecedent debt and proved the existence of such antecedent debt. Thus, the Mortgage is still

valid, as long as the dragnet clause is enforceable and the Bank proved the amount of underlying debt secured thereby.[17]

¶ 44. In essence, whether the Bank proved the existence of the May 7 Note is immaterial in this case because we hold that the circuit court and court of appeals erred in finding that the parties intended the Mortgage to secure only the debt evidenced in the Note. We conclude that the plain language of the Mortgage unambiguously indicates an intention on the part of the Waltkes and the Bank that the Mortgage was to secure all of the outstanding Waltke debt. We hold that the Mortgage is valid and enforceable because the parties intended the Mortgage to secure antecedent debt through the dragnet clause, the Bank proved the existence of antecedent debt, and the dragnet clause contained in the Mortgage is valid under Wisconsin law.

¶ 45. Whether a mortgage sufficiently identifies the debt it secures is a factual determination. *Badger State,* 122 Wis. 2d at 723. However, we find that the circuit court erred as a matter of law in determining that the parties intended the Mortgage to secure only the $50,000 debt evidenced in the missing Note. *Mitchell Bank,* 257 Wis. 2d 723, ¶¶ 18–19.

¶ 46. In order to ascertain the intent of the parties with respect to what debt the Mortgage secured,

---

[17] We note that if the Bank is correct in its contention that the missing Note was a renewal of antecedent outstanding debt, the Bank may nevertheless be able to recover this amount, if it is included in the antecedent debt that the Bank proves was secured by the dragnet clause.

the circuit court was not required to look beyond the Mortgage document itself. "While intent is a factual matter, . . . the parol evidence rule prohibits a trial court from inquiring into the intent of parties to an unambiguous written agreement." *Schmitz v. Grudzinski,* 141 Wis. 2d 867, 872 n.4, 416 N.W.2d 639 (Ct. App. 1987) (internal citations omitted).[18] "Whether a contract is ambiguous is . . . a question of law which we review *de novo.*" *Id.* at 871. "A contract is ambiguous when it is reasonably susceptible of more than one meaning." *Id.*

¶ 47. First, the Mortgage states that it secures the $50,000 debt as evidenced by the missing Note. More importantly, the Mortgage provides, in pertinent part:

> *This Mortgage is also given to secure* any extension(s) and/or renewal(s) of the note(s) and the payment of any and *all other sums* advanced hereunder or *secured by this Mortgage as further described and permitted in Paragraph 4 below,* for any reason, *and to secure performance of* the covenants, conditions and agreements contained herein or in any note or other evidence of *any of the Obligations* (as hereinafter defined) secured by this Mortgage.

(Emphasis added.) Paragraph Four, the "Dragnet Clause," further provides:

> **Present and Future Advances and Mortgage as Security.** The term "Obligor" as used herein shall include without limitation the Mortgagor, Borrower,

---

[18] The court in *Schmitz v. Grudzinski,* 141 Wis. 2d 867, 871–73, 416 N.W.2d 639 (Ct. App. 1987), concluded that a provision in Real Estate Security Agreement providing that "[c]ustomer . . . grants lender a . . . lien . . . to secure . . . debts . . . arising out of credit previously granted" unambiguously indicated the parties' intent to secure prior debt.

maker, co-maker, endorser or guarantor of any of the Obligations as hereafter defined. *The term "Obligations" as used herein shall include, without limitation, all of the debts, notes, guaranties, obligations and liabilities of whatever nature or amount (and any extension, renewals or modification thereof) arising out of credit or other financial accommodation previously granted,* contemporaneously granted or granted in the future by Mortgagee to or at the request of any Obligor, and the performance of all covenants, conditions and agreements contained in this Mortgage or in any evidence of or document relating to any of the foregoing and, to the extent not prohibited by law, costs and expenses of collection or enforcement of the Obligations . . . . *Since this Mortgage secures all Obligations of any Obligor to Mortgagee, it is acknowledged that it may secure Obligations in a greater dollar amount than the amount stated in this Mortgage . . . .*

(Emphasis added.)

¶ 48. The language of the dragnet clause makes it abundantly clear that the Mortgage was intended to secure all prior obligations and that such obligations may be greater than the face amount of the Mortgage. This language is unambiguous.[19] Thus, "[w]e need not consider the trial court's findings of fact, because the interpretation of a written agreement is a question of law to which we owe no deference to the trial court." *Schmitz,* 141 Wis. 2d at 871. As "[w]e have already concluded that the [mortgage] unambiguously secured previously granted credit[,] . . . the only evidence of [the parties'] intent was the [mortgage], which we have concluded is unambiguous." *Id.* at 872–73. Therefore,

---

[19] This clarity is evidenced by the fact that the title report on the Genesee property states that the Mortgage secures "the originally stated indebtedness of $50,000 *and any other amounts payable under the terms thereof.]"* (Emphasis added.)

we disregard the circuit court's finding as to the intent of the parties because the Mortgage unambiguously states that it secures all prior debts in addition to the debt listed at the top of the Mortgage. Thus, we conclude that the parties intended the Mortgage to secure antecedent debt.

¶ 49. There is no dispute the Bank proved a substantial amount of underlying antecedent debt. The record is replete with proof that the Waltkes have a substantial amount of antecedent debt due and owing to the Bank. There is no dispute that a portion of the $50,000 advanced to Waltke on September 4, 1986, is still outstanding. The Bank's ledgers, the cashier's check, and the write-off to the FDIC, taken together, conclusively establish that this amount is still due and owing. It is clear from the record that the Bank conclusively established the existence of other outstanding Waltke debt in the form of personal debt, Miracle Shield guaranties, and Gary Butler guaranties. As the court of appeals noted, "Mitchell Bank introduced . . . evidence of ascertainable, underlying prior debts existing antecedent to the Mortgage and Note . . . that remain unpaid by the Waltkes and that fall under the dragnet clause. *Mitchell Bank*, 257 Wis. 2d 723, ¶ 21. Assuming the dragnet clause is valid, it is for the circuit court on remand to make factual findings as to the precise amount of this debt.[20]

---

[20] As noted *supra*, the Waltkes did not answer the Bank's complaint in the underlying foreclosure action. The Bank's complaint alleges the following:

 That on May 7, 1987 Alfred G. Waltke and Marilyn M. Waltke, his wife, executed a Real Estate Mortgage subsequently recorded on June 2, 1987 at 9:00 AM by the Register of Deeds . . . obliga-

## C. Validity of the Dragnet Clause

■

¶ 50. Having determined that the parties *intended* the Mortgage to secure antecedent debt and that the Bank proved the existence of such antecedent debt, the final question we address is whether the "dragnet clause" purporting to secure the antecedent debt, is, as a matter of law, enforceable in Wisconsin, such that the Mortgage *actually* secured the prior debt in this case. "Whether a mortgage containing a dragnet clause is enforceable in Wisconsin is a question of law which we shall decide independently without deference to the decision of the trial court." *Badger State,* 122 Wis. 2d at 723.

---

tions to the Bank incurred in the past or to be incurred in the future including liability for personal guarantees of the obligations of others.

That regarding such obligations there is currently due for principal the total of $74,451.93 plus interest in the amount of $149,789.83, for a total amount due of $224,241.76 as of May 1, 2000.

(Pet'r. Complaint at ¶¶ 7–8).

The complaint alleged that some $224,241.76 in principal and interest relate to the Mortgage. This amount is far in excess of the $50,000 debt referenced at the top of the Mortgage. Because the Waltkes did not answer the complaint, under § 802.02(4), they essentially admitted the allegation that the Mortgage secured more than just the $50,000 loan stated at the top of the Mortgage. The Bank, however, cannot rely on the Waltkes' failure to answer as proof of the exact amount of debt that is outstanding. Wisconsin Stat. § 802.02(4) provides, "[a]verments in a pleading to which a responsive pleading is required, *other than those as to the fact, nature and extent of injury and damage,* are admitted when not denied in the responsive pleading . . . ." (Emphasis added.)

602

¶ 51. Schanke argues that in order for a dragnet clause to be valid, it must clearly state that it secures antecedent debt and must also either specifically list the individual debts or the total amount of antecedent debt secured by the dragnet clause. In contrast, the Bank contends that in antecedent debt cases, a dragnet clause is valid if the mortgage clearly and unambiguously states that it secures antecedent debt; it is not necessary to list the specific amount of each debt secured. The amicus curiae, the Wisconsin Bankers Association (WBA), maintains that a dragnet clause securing antecedent debt is valid as long as the relation between the debt and the security for the debt is not wholly unclear. Both the Bank and the WBA are partially correct. We hold that a dragnet clause securing antecedent debt is enforceable in Wisconsin if the mortgage clearly states that it secures antecedent debt and the relation between the debt and the security for the debt is not wholly unclear.

¶ 52. The first case interpreting the validity of dragnet clauses in Wisconsin was *Capocasa v. First National Bank,* 36 Wis. 2d 714, 154 N.W.2d 271 (1967). In *Capocasa,* a husband and wife had executed a joint mortgage containing a dragnet clause that purported to secure all future indebtedness of the parties. The question before the court was whether the dragnet clause would allow the husband to encumber his wife's interest in the property by virtue of his unilateral subsequent borrowings. *Id.* at 716–20. The court noted that dragnet clauses are "looked upon with disfavor by the courts . . . and 'should be closely scrutinized.' " *Id.* at 721 (citations omitted).

¶ 53. The court also noted that under one view, "the contemplation of the parties" test,

the security will not be extended as to antecedent debts unless the instrument so provides and identifies those intended to be secured in clear terms, and, to be extended to cover debts subsequently incurred, these must be of the same class and so related to the primary debt secured that the assent of the mortgagor will be inferred.

*Id.* at 723–24 (internal citations & quotations omitted). The court ultimately rejected the "contemplation of the parties" test in the context of joint mortgagors, noting:

There seems to be no good reason for one who has executed a mortgage with [a] "dragnet" clause to be permitted to escape its consequences for his personal borrowing merely because subjectively it was not within his contemplation (contrary to the words of the written instrument) that an additional obligation to the same creditor would subject his property to the "dragnet" feature of the mortgage.

*Id.* at 724.

¶ 54. The court in *Capocasa* went on to hold that:

[W]hen a "dragnet" clause is made part of a mortgage executed by joint tenants, each mortgagor pledges his undivided interest in the mortgaged property to secure (1) the joint indebtedness or other indebtedness specifically named in the instrument, *and any existing or future joint indebtedness* of the mortgagors to the mortgagee; (2) *any existing or future individual indebtedness to the mortgagee* . . . .

*Id.* at 726–27 (emphasis added). Notably the court did not state that the "existing indebtedness" had to be specifically named. Under *Capocasa,* a dragnet clause will secure "indebtedness specifically named in the instrument, *and* any existing . . . indebtedness." *Id.* (emphasis added).

¶ 55. The court in *John Miller Supply Co. v. Western State Bank,* 55 Wis. 2d 385, 390, 199 N.W.2d 161 (1972), also addressed the validity of a dragnet clause purporting to secure debts incurred subsequent to the execution of a mortgage. The court considered whether the common law relating to dragnet clauses survived the adoption of the Uniform Commercial Code, Article 9. *Id.* at 393–94. The court ruled that the common law remained the same since the adoption of Article 9 of the Uniform Commercial Code:

> "Where [the other indebtedness] is antecedent it must be identified in clear terms, and where it is subsequent, it must be of the same class as the primary obligation secured by the instrument and so related to it that the consent of the debtor to its inclusion may be inferred."

*Id.* at 394 (citations omitted).

¶ 56. The court ultimately concluded the dragnet clause at issue was not valid under the "contemplation of the parties" test because the future obligations were "not within the clear contemplation . . . of the parties . . . and . . . not of the same nature or related to the types of indebtedness involved in the original financing agreement." *Id.* at 394. *But see Capocasa,* 36 Wis. 2d at 724–27 (explicitly rejecting the "contemplation of the parties" test for subsequent debts secured by a mortgage executed by joint mortgagors).

¶ 57. The court of appeals in *Schmitz* specifically addressed the validity of a dragnet clause securing antecedent debt (the type of dragnet clause at issue in the case at bar). The court summarized the law in relation to dragnet clauses as follows:

> Debts antecedent and debts subsequent to dragnet clauses in security devices require different analyses. In both cases, the policy is "no big surprises." However, in

605

antecedent debt cases, the parties have knowledge of the debt and the security, and the question is whether the two are so wholly unrelated or unclear that as a matter of public policy a court will refuse to enforce the clause as to specific security. Debts subsequent to dragnet clauses are unknown to the parties when the mortgage is given, though a future course of conduct may be contemplated. The similarity between future debts contemplated and future debts incurred is what a court scrutinizes when analyzing subsequent debt cases.

*Schmitz,* 141 Wis. 2d at 874–75. `

¶ 58. Synthesizing the law from these cases, under Wisconsin law, a mortgage with a dragnet clause may properly secure antecedent debts only if the mortgage clearly identifies that it secures antecedent debt, and the relation between the debt and security is not so wholly unclear that as a matter of public policy a court will refuse to enforce the dragnet clause. The parties in the case before us dispute what the phrase "clearly identified" means. Schanke, relying on *Badger State,* contends that this phrase means the *specific antecedent debt* must be clearly identified, that is, listed on the face of the mortgage in dollar amounts. The Bank argues that "clearly identified" merely means that the dragnet clause must unambiguously state that it secures all prior debt.

¶ 59. In this respect, the *Schmitz* decision is enlightening. The dragnet clause in *Schmitz* was part of a Real Estate Security Agreement (RESA) that provided: " 'Customer . . . grants lender a . . . lien . . . to secure . . . debts . . . arising out of credit previously granted.' " *Id.* at 871. The debtor in that case, through the RESA, gave the bank a lien on his farm in exchange for a $9,000 loan. *Id.* at 869. The debtor had also taken

606

out substantial previous loans for his farm operation that were secured with personal property. *Id.* The court first concluded that the language in the RESA unambiguously secured previously granted obligations. *Id.* at 871–72. The court then went on to uphold the dragnet clause within the RESA, in a factual scenario not dissimilar to our own, stating:

> Though the prior loans were secured by personal property, the additional . . . credit made the total debt substantial, and in the absence of a RESA, the $9,000 would have been unsecured. . . . [Both the bank and the debtor] knew that . . . [the debtor] was increasing his indebtedness for the third consecutive year. The previously pledged collateral was one or two years older. *There is no surprise* in either the bank's request to become secured or in [the debtor's] accession to that request.

*Id.* at 875–76 (emphasis added).

¶ 60. Thus, even though the RESA in *Schmitz* did not state the specific amount of antecedent debt secured by the dragnet clause, the court nonetheless enforced the dragnet clause because the language stating that the lien " 'secure[ed] . . . debts . . . arising out of credit previously granted,' " *id.* at 871, clearly indicated that the RESA secured the prior debt. Further, the nature of the prior debtor-creditor relationship between the parties was such that allowing the lien to secure the past debt would come as no surprise to the parties. *Id.* at 875–76.

¶ 61. Schanke argues that *Badger State* stands for the opposite proposition, as the court there stated: "We conclude that because the amount of debt was stated in the mortgage and is identifiable from the mortgage documents, the mortgage is enforceable." *Badger State,* 122 Wis. 2d at 721. This is the precise language the

607

court of appeals below used to posit the "obvious corollary" that "if the amount of debt is not both stated in the mortgage and identifiable from the mortgage documents, the mortgage is not enforceable." *Mitchell Bank,* 257 Wis. 2d 723, ¶ 27. However, this interpretation is a misreading of the holding of *Badger State* because the court in *Badger State* merely held that stating the dollar amount of the antecedent debt was sufficient, but not necessary, to render the dragnet clause enforceable. *Badger State,* 122 Wis. 2d at 724.

¶ 62. The junior interest holder in *Badger State* made the same argument Schanke is making in this case: "[A] mortgage containing a dragnet clause for antecedent debts which does not specifically identify the underlying debt is not enforceable in Wisconsin." *Id.* at 724. The *Badger State* court did not accept this argument, noting that this court in *Capocasa* held: "[A] dragnet clause in a mortgage may secure 'any existing or future individual indebtedness to the mortgagee . . . .' " *Id.* (quoting *Capocasa,* 36 Wis. 2d at 727). The court in *Badger State,* 122 Wis. 2d at 724, concluded: "[A] dragnet clause may cover any specifically named debt *and any existing debt.*" (Emphasis added.) Notably, like *Capocasa,* the *Badger State* court did *not* say that a dragnet clause covers only specifically named debt and *specifically named* existing debt.

¶ 63. The *Badger State* court went on to find that "[i]n this case, the amount of indebtedness . . . is plainly stated on the face of the mortgage. . . . We conclude, therefore, that [the] mortgage is enforceable." *Id.* The *Badger State* court did not state that existing debt had to be specifically named for a dragnet clause to be valid. It merely held that when the amount of the antecedent debt *is* specifically stated on the face of the mortgage,

608

this is sufficient to render the antecedent debt "clearly identified," such that the dragnet clause is enforceable.

¶ 64. In other words, under *Badger State,* it is *sufficient* if the amount of the debt is specifically stated on the face of the mortgage, but *Badger State* cannot be read for the proposition that it is *necessary* for the amount of debt to be specifically stated on the face of the mortgage in order for a dragnet clause to be enforceable. Thus, the court of appeals' "obvious corollary" is, in fact, a logical fallacy. This conclusion is buttressed by the fact that the *Schmitz* decision came two years after *Badger State,* and in its exhaustive summary of Wisconsin dragnet clause law, the court in *Schmitz* came to the exact opposite conclusion than that advanced by Schanke.

¶ 65. In the case before us, the Mortgage clearly states that it secures all "obligations." Further, it states:

> The term *"Obligations"* as used herein *shall include,* without limitation, *all of the debts, notes, guaranties, obligations and liabilities of whatever nature or amount* (and any extension, renewals or modification thereof) *arising out of credit* or other financial accommodation *previously granted, contemporaneously granted or granted in the future* by Mortgagee to or at the request of any Obligor . . . .

(Emphasis added.) This language clearly states that all prior debts are secured by the Mortgage. Under the rationale of *Schmitz,* a dragnet clause securing all " 'debts . . . arising out of credit previously granted' " was sufficiently clear to enforce the clause. *Schmitz,* 141 Wis. 2d at 871. Here, the Mortgage secures any "obligations," defined in the dragnet clause as "credit . . . previously granted, contemporaneously granted or granted in the future." Thus, the pertinent

language in the dragnet clause here is virtually identical to the operative language in the dragnet clause in *Schmitz.*[21]

■■

¶ 66. Schanke's contention that the individual antecedent debts must be specifically listed is in accord with the "contemplation of the parties" test. *See Capocasa,* 36 Wis. 2d at 724 (noting that "the 'contemplation of the parties' cases deny any coverage under the 'dragnet' clause unless the obligation to be blanketed in is specifically mentioned . . . "). Yet, this test was specifically rejected in *Capocasa* when dealing with joint mortgagors. *Id.* at 724–25 (rejecting the "contemplation of the parties" test in favor of the Iowa approach). *But see John Miller Supply Co.,* 55 Wis. 2d at 392 (incorrectly stating that *Capocasa* adopted the "contemplation of the parties" test). Also, this was not the test utilized by *Badger State* or *Schmitz.* Simply put, not a single Wisconsin court addressing antecedent debt secured by a dragnet clause has *required* the antecedent debt to be specifically listed in dollar amounts in the mortgage in order for the mortgage to be enforceable.

¶ 67. In addition, the WBA has brought to our attention the fact that a RESA, the type of security agreement in *Schmitz,* by its nature does not list the precise amount of debt on the face of the instrument. *See Schmitz,* 141 Wis. 2d at 870 (noting that "a RESA does not show the sum of money it secures"). While the

---

[21] *See also In re Octagon Roofing v. NBD Park Ridge Bank,* 124 B.R. 522, 528 (Bankr. N.D. Ill. 1991) (quoting *Nat'l Acceptance Co. of America v. Exchange Nat'l Bank of Chicago,* 243 N.E.2d 264, 268 (Ill. App. 1968)) (noting that the dragnet clause securing all "past, present, and future debt 'in addition to the note described above' " clearly identified antecedent debt, while the dragnet clause securing "all indebtedness" did not).

security agreement before us is a mortgage and not a RESA, both contain almost identical language, and if we were to accept Schanke's argument that a dragnet clause must specifically list the amount of antecedent debt, we would, in effect be overruling *Schmitz*.

¶ 68. More importantly, were we to agree with Schanke, we would essentially invalidate all RESAs. Schanke himself argues in his supplemental brief, "[t]he RESA may be a flawed instrument as well." (Resp't Supplemental Br., 18). Thus, Schanke at least implicitly concedes that his position is contrary to the *Schmitz* decision. While it may be the better practice for a mortgagee to specifically list the specific amount of debt secured in a mortgage via a dragnet clause, the above authorities clearly demonstrate this is not required under Wisconsin law.

■■■

¶ 69. The decisions in *Capocasa, Badger State,* and *Schmitz* make clear that as long as the dragnet clause clearly states that it secures all past or antecedent debt, the dragnet clause is presumptively valid. However, as the *Schmitz* court recognized, the determination as to whether a dragnet clause is valid turns not only upon the language used in the mortgage, but also upon whether, the debt and the security "are so wholly unrelated or unclear that as a matter of public policy a court will refuse to enforce the clause as to specific security." *Schmitz*, 141 Wis. 2d at 874–75. The court of appeals in *Schmitz* correctly recognized that ultimately, the decision to enforce a dragnet clause is a policy decision, dependent on the case specific circumstances. *Id.* at 874–76.

¶ 70. Thus, the *Schmitz* court analyzed the particular relationship between the debtor and creditor to determine whether the relation between the debt and

the security was "wholly unrelated or unclear." *Id.* The court reasoned that while the debtor's initial obligation was secured, the subsequent borrowings of the debtor made his total debt substantial and were it not for the dragnet clause, a significant amount of his debt would have been unsecured. *Id.* at 875–76. The court further noted that the original collateral was a few years older than the recent debt and the debtor had consistently increased his indebtedness since pledging the initial security. *Id.* at 876. The court concluded that based on this relationship "[t]here is no surprise in either the bank's request to become secured or in [the debtor's] accession to that request." *Id.*

¶ 71. Here, the business notes themselves establish the relationship between the prior debt and the Mortgage. The September 4, 1986, $50,000 note clearly states on its face: "This Note is secured by all existing *and future security agreements and mortgages* between Bank and Maker, between Bank and any indorser *or guarantor* of this Note, and *between Bank and any other person providing collateral security for Maker's obligations . . . .*" (Emphasis added.) The March 3, 1987, renewal note, renewing this $50,000 obligation, contains the same language, as do the Gary Butler notes, the Miracle Shield International note, and the Universal Graphics notes, of which Waltke was guarantor. By signing the Mortgage, Mrs. Waltke pledged her interest in the Genesee property as security for this debt. Thus, Mrs. Waltke constitutes a "person providing collateral security for [the] Maker's obligations."

¶ 72. Like the debtor in *Schmitz,* 141 Wis. 2d at 875–76, the Waltkes owed the Bank a substantial amount of previous unpaid debt. As in *Schmitz,* it cannot seriously be argued in this case that the fact the

Mortgage secured all outstanding Waltke obligations came as a "big surprise" to Waltke. At the time the Mortgage was executed, the Waltkes were fast approaching insolvency, if not already de facto insolvent. Given the amount of indebtedness and frequency with which Waltke was taking and guarantying loans in 1986 and 1987, it is fair to say that he was a relatively sophisticated businessman. If Waltke possessed enough financial prowess to secure multiple loans for his business interests, he certainly can be charged with knowledge of the plain language of the notes. *See Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶¶ 29–30, 259 Wis. 2d 587, 657 N.W.2d 411.

¶ 73. Finally, the title report on the Genesee property describes the Mortgage as securing "the originally stated indebtedness of $50,000 *and any other amounts payable under the terms thereof.]*" (Emphasis added.) In light of the amount of outstanding obligations Waltke owed to the Bank, it is not at all surprising that the Mortgage would secure these obligations. Given the language of the Mortgage clearly identifying "credit previously granted" as being secured under the Mortgage and the nature and extent of the Waltkes' prior indebtedness with the Bank, it could not come as any surprise or be "wholly unclear" to the Waltkes that the Mortgage executed May 7, 1987, secured all previous indebtedness.

¶ 74. Yet, the case before us is more complicated than *Schmitz,* as both Mr. and Mrs. Waltke signed the Mortgage and the Bank is seeking to foreclose upon property in which Mrs. Waltke has an undivided one-

half interest.[22] One could argue that it is inequitable to allow the Bank to proceed on Mrs. Waltke's interest in the mortgaged property when the debts secured by the Mortgage are those of her husband.[23] However, *Capocasa* set forth the standard for what debts a dragnet clause may properly secure when a mortgage is jointly executed:

> We conclude therefore that, when a "dragnet" clause is made a part of a mortgage executed by joint tenants, each mortgagor pledges his undivided interest in the mortgaged property to secure (1) the joint indebtedness or other indebtedness specifically named in the instrument, and *any existing* or future *joint indebtedness of the mortgagors* to the mortgagee; (2) *any existing* or future *individual indebtedness to the mortgagee;* and (3) any future debt of his comortgagor which is known to him and to which he consents to be a lien upon his interest; provided (4), in addition, that whenever the proceeds or the benefits derived from the other mortgagor's contracting a further obligation inure to the enhancement of his interest, the "dragnet" clause will be construed to cover such indebtedness to the extent of that enhancement notwithstanding the fact that the mortgagor did not know of or consent to the indebtedness.

*Capocasa,* 36 Wis. 2d at 726–27 (emphasis added).

---

[22] Recall that Schanke purchased Mr. Waltke's interest in the property in a sheriff's sale, following his successful action against Mr. Waltke to collect an unpaid debt.

[23] In fact, Schanke argued during the first hearing of this case that it would be unfair to force Mrs. Waltke to pay for the prior debt because although she signed the Mortgage, she did not sign the prior notes and there is no indication that she knew about the prior debt. Schanke specifically referenced *Capocasa v. First National Bank,* 36 Wis. 2d 714, 154 N.W.2d 271 (1967).

¶ 75. *Capocasa* involved the individual indebtedness of one spouse, unknown to the other, incurred subsequent to the execution of the mortgage. *Id.* at 716–17. Thus, the *Capocasa* court applied the fourth factor to conclude that while the husband's interest in the mortgaged property was subject to the dragnet clause, his wife's interest was not, as the subsequent indebtedness did not benefit the wife's interest in the property. *Id.* at 727. Under *Capocasa,* one spouse's knowledge of debts incurred by the other spouse is not controlling in determining whether the dragnet clause is valid. *See id.*

¶ 76. The court of appeals in *Schmidt v. Waukesha State Bank,* 204 Wis. 2d 426, 438, 555 N.W.2d 655 (Ct. App. 1996), confirmed the vitality of *Capocasa,* but noted that changes in marital property law since *Capocasa* was decided would affect the application of the rule it set forth. *Id.* at 441–43. While, *Schmidt,* like *Capocasa,* involved debt incurred subsequent to the execution of the mortgage, *Schmidt,* 204 Wis. 2d at 430, the court of appeals specifically noted that Wisconsin's marital property law could affect the ability of a dragnet clause to secure existing indebtedness because "[a]fter all ... the very concept of 'individual indebtedness' would certainly be affected by the marital property law's modern view of whether, and under what circumstances a spouse may incur an indebtedness that is strictly 'individual.' " *Id.* at 441.

¶ 77. *Schmidt* noted that under Wis. Stat. § 766.55(2)(b),

> "*an obligation incurred by a spouse in the interest of the marriage* or the family may be satisfied only from all marital property and all other property of the incurring spouse." ... [However, Wis. Stat. § 766.55(2)(d) provides] "that *any other obligation* incurred by a spouse

615

during marriage, including one attributable to an act or omission during a marriage, may be satisfied only from property of that spouse that is not marital property and from that spouse's interest in marital property, in that order. Thus, the issue is whether [the loans of one spouse] were "obligations incurred . . . in the interest of the marriage," under § 766.55(2)(b), or "other obligations," under § 766.55(2)(d).

*Schmidt,* 204 Wis. 2d at 441–42 (emphasis in original). The court in *Schmidt* also noted that under Wis. Stat. § 766.55(1), an " 'obligation incurred by a spouse during marriage, including one attributable to an act or omission during marriage, is *presumed* to be incurred in the interest of the marriage of the family.' " *Id.* at 442 (emphasis in original).

¶ 78. The debt in *Schmidt* fell under the fourth factor articulated in *Capocasa. Id.* at 442. Nonetheless, the court of appeals' discussion of marital property law as it relates to the enforceability of a dragnet clause contained in a mortgage executed by spouses is pertinent to the resolution of the case at bar. *Schmidt* recognized that under the presumption created by § 766.55(1), "once the bank established the basic fact that the loans to Larson were incurred during the marriage, it became Schmidt's burden to prove by a preponderance of the evidence that the loans to Larson under consideration were not incurred in the interest of the marriage or the family." *Id.* at 443.

¶ 79. Therefore, under Wis. Stat. § 766.55 (1985–86), the debts of Mr. Waltke are presumed to have been incurred in the interest of the marriage, as Mrs. Waltke did not testify to the contrary.[24] As such,

---

[24] Wisconsin Stat. § 766.55 provides, in pertinent part:

Mr. Waltke's debts are property considered existing joint indebtedness. Under the second *Capocasa* factor, a mortgage jointly executed with a dragnet clause properly secures "any existing or future *joint* indebtedness of the mortgagors to the mortgagee." *Capocasa,* 36 Wis. 2d at 727 (emphasis in original).

¶ 80. We therefore hold that the dragnet clause in the May 7, 1987, Mortgage is valid and enforceable under Wisconsin law because the Mortgage clearly states that it secures antecedent debt and the relation between the debt and security are not so wholly unrelated or unclear. As such, the dragnet clause properly secured the existing indebtedness of the Waltkes at the time it was executed.

¶ 81. Thus, the circuit court's factual finding that the Bank did not prove the existence and terms of the missing Note is immaterial and non-determinative to the outcome of this case, because the circuit court improperly failed to consider the Bank's proof of the antecedent debt that the Mortgage secured. Because we determine that the parties in this case did intend for the Mortgage to secure antecedent debt and that the dragnet clause is enforceable, we reverse the court of

(1) An obligation incurred by a spouse during marriage, including one attributable to an act or omission during marriage, is presumed to be incurred in the interest of the marriage or the family. . . .

(2) After the determination date all of the following apply:

. . . .

(b) An obligation incurred by a spouse in the interest of the marriage or the family may be satisfied only from all marital property and all other property of the incurring spouse.

The applicable "determination date" here is January 1, 1986. Wis. Stat. § 766.01(5) (1985–86).

appeals' determination that the Mortgage is invalid because the Bank failed to prove the existence of debt underlying the Mortgage.

## V. SUMMARY

¶ 82. In conclusion, we reverse the court of appeals' decision insomuch as it affirmed the circuit court's determination that the Mortgage was invalid for lack of consideration. The Mortgage at issue is an executed contract under seal, and under Wisconsin law the seal operates as conclusive proof of consideration in the absence of proof of fraud. Schanke did not prove fraud at the circuit court. Therefore, the Mortgage is not invalid for lack of consideration.

¶ 83. Next, we reverse the court of appeals' determination that the Mortgage was invalid because the Bank failed to prove the existence of underlying debt. While the Bank may have failed to prove the existence of the debt referenced in the missing Note, we conclude that the Mortgage is valid and foreclosable because: 1) the plain language of the Mortgage indicates that the parties intended for the Mortgage to secure antecedent debt; 2) the Bank proved the existence of a large amount of underlying antecedent debt; and 3) the dragnet clause securing that antecedent debt is valid under Wisconsin law.

¶ 84. Thus, we reverse the decision of the court of appeals in its entirety, but remand to the circuit court for specific findings as to the amount of debt owed to the Bank. On remand, the Bank will have to prove Waltke's precise liability on each outstanding loan, when the loans became due, and the applicable interest rate for each outstanding loan. While the record before us is replete with evidence of prior outstanding debt,

618

this court is not a fact-finding body. The circuit court is better suited to make these precise determinations.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.